Richard MOORE, Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 1082 S 400.

Supreme Court of Indiana.

June 26, 1985.

Rehearing Denied Aug. 19, 1985.

Kenneth M. Stroud, Indianapolis, John Proffitt, Campbell, Kyle & Proffitt, Noblesville, for appellant.

Linley E. Pearson, Atty. Gen. of Ind., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-Appellant Richard Donald Moore pleaded guilty to three counts of murder, Ind.Code § 35–42–1–1 (Burns 1985), and was sentenced by the Hamilton Superior Court to death pursuant to Indiana's death penalty statute, Ind.Code § 35–50–2–9 (Burns 1979). Appellant now directly appeals and raises the following six consolidated issues which pertain only to his death sentence:

1. whether Appellant's death sentence is unconstitutional because this Court alleg-

edly has failed to promulgate rules by which it can conduct a meaningful, to-wit: proportionality, review of Appellant's sentence;

2. whether certain aggravating circumstances established by Indiana's death penalty statute are unconstitutional as applied in Appellant's case, namely.

(A) Ind.Code § 35–50–2–9(b)(8), and

(B) Ind.Code § 35–50–2–9(b)(6);

3. whether sufficient evidence supported the trial court in finding the aggravating circumstance in Appellant's case predicated upon the murder of a police officer;

4. whether the trial court erred by failing to find certain mitigating circumstances, namely;

(A) Ind.Code § 35–50–2–9(c)(1),

(B) Ind.Code § 35–50–2–9(c)(2), and

(C) Ind.Code § 35–50–2–9(c)(7);

5. whether the trial court erred by admitting into evidence during Appellant's sentencing hearing certain allegedly hearsay evidence adduced during Appellant's guilty plea hearing; and

6. whether Appellant's death sentence is invalid because Indiana's death penalty statute does not require this Court to find that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt.

The record in this case reveals the following. On November 7, 1979, the Marion County Prosecutor filed an Information in the Marion Superior Court, Criminal Division, charging Appellant in nine counts with the following crimes:

I. murder of Rhonda L. Moore by shooting her with a shotgun;

II. murder of John H. Caldwell by shooting him with a shotgun;

III. murder of Gerald F. Griffin by shooting him with a shotgun;

IV. attempted murder of Ruth B. Caldwell by shooting her with a shotgun;

V. attempted murder of Roy Potter by shooting him with a shotgun;

VI. attempted murder of Cicero Mukes by shooting him with a shotgun;

VII. criminal confinement of Rhonda L. Moore while armed with a shotgun;

VIII. criminal confinement of John H. Caldwell while armed with a shotgun; and

IX. criminal confinement of Ruth B. Caldwell while armed with a shotgun.

The Prosecutor also filed at that time a separate document styled "Information for DEATH SENTENCE" which alleged the following three aggravating circumstances:

1. Appellant murdered Gerald F. Griffin who was, at the time of his murder, a law enforcement officer acting in the course of his official duty [See Ind.Code § 35–50–2–9(b)(6)(i)];

2. Appellant committed another murder in addition to the murder of Gerald F. Griffin in that he murdered John H. Caldwell [See Ind.Code § 35–50–2–9(b)(8)]; and

3. Appellant committed still another murder in addition to the murder of Gerald F. Griffin in that he murdered Rhonda L. Moore [See Ind.Code § 35–50–2–9(b)(8)].

Appellant was arraigned on December 27, 1979, having been hospitalized ever since the Informations were filed. Two attorneys were appointed to represent Appellant and he pleaded not guilty at that time. Appellant's "Petition To Allow Marriage" was granted. Appellant filed for a change of venue from the county on January 7, 1980, which request was granted on January 10, 1980. All parties subsequently stipulated to a change of venue to Hamilton County and the Hamilton Superior Court, Division 2, assumed jurisdiction. On March 13, 1980, Appellant's original trial counsel withdrew and an attorney from Hamilton County was appointed to represent Appellant. An aggressive campaign of discovery thereafter ensued. On April 8, 1980, Appellant filed a motion captioned "Request to File Notice of Intent to Raise Defense of Insanity." The trial court apparently took said motion under advisement and appointed two disinterested psychiatrists, Dr. Dwight W. Schuster and Dr. John E. Kooiker, to examine Appellant as

to "his competency at the time of the incident, his present competency to stand trial and his ability to assist in his defense." Dr. Schuster filed his written report on May 27, 1980. His report concluded:

"As the result of my examination it is my opinion that the defendant has sufficient comprehension to understand the charges against him, the proceedings thereto, and to assist his attorney in his own defense. Further, I believe that he was of sound mind or legally sane on the date of the alleged offense."

Dr. Kooiker's report, filed on June 16, 1980, concluded:

"In the opinion of this examiner, the patient could be considered of sound mind at the time of the alleged crime. At the present time he is considered competent to assist his attorney in his defense and to stand trial on the charges."

The trial court allowed Appellant to be examined by the psychiatrists in their offices and allowed Appellant to visit his counsel's office twice a week even while still incarcerated in Marion County to be close to certain medical facilities. On May 19, 1980, the trial court granted Appellant's "Petition For Authority To Hire Research Assistant." The first pretrial conference was held on June 19, 1980, at which time the trial court formally allowed Appellant to file his "Notice Of Intent To Raise The Defense Of Insanity" and granted Appellant's motion for funds to hire Dr. Larry M. Davis, a psychiatrist, and Associate Professor Cathy S. Widom, Ph.D., a psychologist. Dr. Davis filed a written report on July 18, 1980, in which he concluded:

"At this time [Appellant] is fully competent to stand trial, participate with counsel, and understand the charges against him and aid in his defense. It is obvious that at the time of the shooting [Appellant] was operating under heavy stress and the dissolution of his marriage and the feeling that his in-laws were preventing a possible reunion. Although this behavior was dramatically out of character for [Appellant], I find no evidence that he was unaware at the time of right

from wrong. Furthermore, I cannot establish beyond reasonable doubt that he was insane at the time of the shooting in the sense of being unable to adhere his behavior to the right."

Dr. Widom never filed any reports in this case but did testify during Appellant's sentencing hearing.

On Appellant's trial date, August 25, 1980, Appellant appeared before the trial court and withdrew his pleas of not guilty by reason of insanity and entered pleas of guilty to Count I-murder, guilty to Count II-murder, and guilty to Count III-murder. The trial court thereupon conducted a hearing to determine the voluntariness of Appellant's guilty pleas. The trial court examined Appellant about his mental status and about his knowledge of the many constitutional rights he was waiving by pleading guilty. The trial court specifically informed Appellant of the minimum and maximum penalties he faced by pleading guilty as charged and reminded Appellant that the State was seeking a death penalty for him. The trial court also carefully advised Appellant that by pleading guilty he would waive his right to have a jury recommend to the trial court whether or not a death penalty should be imposed against Appellant. Appellant consistently stated, without equivocation, that he understood everything that the trial court was discussing with him and that he knew what he was doing. Appellant also stated his belief that he had been adequately and satisfactorily represented by his counsel and that he had not been forced, threatened or induced in any way to enter his guilty pleas. We note that there was no plea agreement in this case. A factual basis for Appellant's three guilty pleas was presented to the trial court by the State and Appellant confessed three different times to having committed the three murders charged in Counts I, II and III. Having carefully and comprehensively examined Appellant, the trial court accepted Appellant's guilty pleas and found Appellant guilty of the three murder counts. A pre-sentence report was ordered to be prepared and a sentencing hearing subsequently was scheduled. On August

29, 1980, the Marion County Prosecutor moved the trial court to enter a *nolle pro-sequi* to Counts IV through IX in Appellant's case.

Appellant's sentencing hearing commenced on October 22, 1980, and lasted approximately three days during which time a substantial amount of evidence was presented. Arguments also were made by both the State and Appellant as to whether or not a death sentence should be imposed. The evidence presented showed that at approximately 7:15 p.m. on November 6, 1979, forty-eight year old Appellant went to the house located at 4702 West 36th Street, Indianapolis, where his ex-wife, twenty-seven year old Rhonda Caldwell, was residing with her mother, Ruth Caldwell, and her father, John Caldwell. Appellant and Rhonda, Appellant's second wife, were officially divorced on October 29, 1979, just eight days before the instant murders. Appellant testified during his sentencing hearing and recalled, on direct examination, the events which transpired during the evening of November 6, 1979, as follows:

"I've been a hunter all my life.... It was almost time to go hunting. My vacation was going to start that Friday and I was going to go hunting and I had taken my guns to work to show to people at work my guns, which I did every year and talked of hunting and I kept my guns in the car covered with a blanket and that's where they were. They were loaded, they were loaded because I used a shotgun to train myself.... I talked to Rhonda on that evening I believe.... We had an argument about calling the house and cussing Chris [McPhail, Appellant's present wife who was then living with Appellant,] out and instead of letting Chris mail the [medical] bill to her, I told her I'd take it by myself.... It was her bill.... I was going over to 56th Street anyway so I thought I'd drop it off at her house while I was going over there.... Going to do a little poaching for deer.... And Rhonda, I asked her, I said, I know you got a date but I got to see you about this bill. I want you to tell these people not to send it to my house so you won't have to call her and cuss Chris out and that led to another argument and I hung up and I think she called back and then she hung up and then I went over to her house.... I didn't park my car in front of the house because when I passed by the house, I saw Rhonda sitting in the front room dressed up. For Rhonda to be dressed up at that time of night, I knew she was going out. So I didn't park my car in front of the house. I went down the street and then came back and parked in front of Mr. Butch Heiden's house. And I got the bill and I went and knocked on the patio door, the side door. She came to the door and I presented her with the bill. And that's when we began to talk. She came out and she put, she came out and she went back in and got her father's jacket, put it on and came back out again cause I said we ought to talk a little bit. And that's when we decided we were going to go out on our anniversary. And that's when I broke down and told her that I would do anything, I'd drink, I'd do anything to get you back and we talked about selling the house and moving on the west side and changing jobs and we could make it again. That's what we talked about, you know, really getting back together again.... We both were crying and her mother, I didn't know it at the time but her mother was in Rhonda's bedroom window looking out; I didn't know it and she came around to the front door with her husband [John] and said, all right Rhonda, that's enough, come on in now. And I said, well we're not through talking yet and John said, well come on in. And I went in with them. My mother-in-law was first, my father-in-law, then Rhonda and myself, I followed them in. I had my arm around Rhonda all the way up to the front room and Johnny said, well, my father-in-law said, that's enough. You ought to leave now. I said okay, I'll leave cause she had the bill. I left and went back to my car. I knew I was going over to 56th Street so I put on my,

I had put my guns in the front seat, I put on my shell vest and I thought well I'll go back and talk to Johnny, see if he'll talk to me again and I had my shotgun with me. If he sees this, he'll know that I'm serious. He'll talk to me. Johnny was behind, between the kitchen and the front room was a partition there, he stuck his head out—I knocked on the [back] door and he stuck his head out and waved you can't come in. And I took my shotgun and poked it through the window and pulled the trigger. And I think I fired twice into the house. And the glass was broken and I reached around, I really couldn't, it was a double lock and it wouldn't open without a key so I went around to—... the front of the house and went through the window. Now the door had the double lock on it but it was open and the screen door was open because Johnny generally lets the dog out before he goes to bed but I didn't think of that; I went through the window. And I don't know, there was a lot of screaming and yelling and I don't know when I shot Rhonda. I do know that I went into the bedroom and told my mother-in-law this is all her fault, she should have let us, left us alone, she should have let us go back together when she had the say yes or no, she should have let us go back together as a married, because we were still married at the time and it was all her fault and I said, you finally happy you got your daughter whoring like you always was talking about, always telling me about, you finally got happy so you guys can run together now and have ball. And I shot her. I didn't aim at anyplace, I just shot her. And the phone rang, I remember going into the kitchen to answer the phone....—and the fellow asked me, is Rhonda home and I said, yes, but this is her husband talking and he hung up. And at that time a face and a gun I looked out from behind—like the china cabinet is here and the phone is here on the wall and I looked out like that and there was a face and a gun and I turned around and dropped the phone and the phone hit the wall and I turned around and shot and—... Rhonda was on the kitchen floor, she was on the kitchen floor and I was arguing with her, whether she was dead or not, I don't know, but I was fussing about, look what we got ourselves into now. It's too late for anything. My life has ended. I think I went back into the bedroom, I'm not sure of that. I know the T.V. was on; I shot the lights out. In the front room, the lamp, it used to be our lamp I saw it and I shot that out.... After I shot the T.V. out, I shot that out and from there I just can't recall my exact movements. I know I asked the Lord to forgive me for what I was about to do and I put my gun to my stomach and pulled the trigger and I was knocked up against the wall and I fell forward and I went out and I came to, I was at the [dead] dog's feet and I knew I didn't want to die at the dog's feet and I pulled myself up toward the door to die. Voices and a bullhorn and a man was talking telling me to hang the phone up. I remember laughing because I'm dying and he wants me to hang up the phone, ain't that a joke."

Other evidence admitted during Appellant's sentencing hearing established that John Caldwell was found in his living room dead from shotgun blasts to his abdomen and thorax, Rhonda Caldwell was found in the kitchen dead from multiple shotgun wounds to her lower abdomen and Ruth Caldwell was found in her rear bedroom injured by separate shotgun blasts to her right arm and to her buttocks. The man found dead near the outside entrance to the kitchen of the Caldwell home was Gerald Griffin.

Several Indianapolis Police Officers testified that Gerald Griffin was a fellow Indianapolis Police Officer who was in full uniform, without hat, and was acting in the course of his official duties when shot and killed at the Caldwell home. Officer Amos Atwood specifically testified about Officer Griffin and stated that they both responded in their separate cars to the police radio call regarding trouble at the Caldwell

home. Atwood testified on direct examination as follows:

> "After parking my car and I exited from the car, Officer Griffin had gone into the garage patio area and had approached a storm door there at the garage; it's on the west side of the house .... he had his uniform on and the only thing he didn't have was his hat.... There, there was a light on in the garage patio as I approached it and Officer Griffin was already there.... I was approximately 18–20 feet [away from the door] ... Officer Griffin was at the door and had knocked on the door and as he knocked on the door, he was standing there and the next thing I know he went into a crouch, his weapon coming up and he said, "hey man, don't do it" and that's exactly what he said when he was shot.... The only thing I could see was the impact of it going into Officer Griffin on the left side of his chest...."

We note that other evidence presented during Appellant's sentencing hearing established that Appellant shot at least one additional Indianapolis police officer. Assistant Deputy Chief Cicero Mukes testified that he was shot by Appellant as he was responding, in full uniform without hat, to the police radio call for help in his standard Lieutenant's vehicle with flashing red lights on top. He testified as follows:

> "I opened the vehicle door. I got out of, started out of the vehicle, got one foot out, was bringing my other foot out and was turning to the left and I heard a shotgun blast and I could see a ball of fire that came [from the picture window in the front of the Caldwell home] and hit me here [around eye on right side of face] and I fell to the ground."

He also testified that the street lighting where he stopped his vehicle was good and made his car quite visible. Apparently Officer Amos Atwood was shot by a stray bullet during some gunfire which other officers directed at Appellant. Officer Atwood testified that Officer Roy Potter was shot along with Officer Murkes in front of the Caldwell home.

The trial court heard all of this evidence adduced during Appellant's sentencing hearing and also considered the pre-sentence report it had commissioned for Appellant's case. Appellant apparently did not challenge this report which contained the following account given by Ruth Caldwell:

> "Around 7:00 p.m., November 6, 1980, Rhonda, Ruth, and John Caldwell were watching television in the living room and the telephone rang. Rhonda answered the phone. When she got off the phone her mother asked her who it was. Rhonda said it was Richard (Moore) and he had wanted to talk. Rhonda said she told him if he had anything to say to say it on the phone. She said he hung up on her. The phone rang again and Rhonda answered it. When she was through her mother asked who it was and Rhonda said it was Richard again. About 15 minutes later, there was a knock on the door and John Caldwell got up to answer the door. He told Rhonda it was Richard so Rhonda got up and went out on the carport with Richard. Ruth went to the back bedroom in the house and watched them out the window. She observed them talking and then Richard got up and went to the carport door. Ruth observed Rhonda walk over to where he was, now they were facing close to each other and Ruth thought she saw Richard say something and saw tears come to Rhonda's eyes. Ruth then went in the living room and informed John that Rhonda was starting to cry and something was happening. They went to the door and Richard had already left. Ruth heard Rhonda say, "get inside, lock the doors, Richard's got a gun." Then Ruth started screaming and running. She saw smoke in the living room but didn't remember hearing a shot. Then she heard the crash at the back door. Ruth ran to the bedroom where her daughter was on the phone and she heard John say, "my God, Richard, that's my dog." Rhonda dropped the phone and ran out of the bedroom and must have seen Richard because Ruth heard her say, "Richard, please don't kill me, I'll go back with you

or anything. Just please don't kill me." Ruth heard Richard say, "it's too late." Ruth also heard Rhonda say, "Richard, that's my dad." Then Richard came around to the rear bedroom where Ruth was standing sideways and said, "you whore, I'm going to kill you." He then shot the back of her arm. Ruth fell on her back and laid there for a while. Richard returned to the rear bedroom and said to Ruth, "aren't you dead yet?" And Ruth replied, "no Richard, I'm not dead yet." Richard then said, "I'm going to shoot you right in your asshole" and he did."

Having conducted its sentencing hearing as required by our Indiana statutes, the trial court found as follows:

"We've been here approximately three days and heard a substantial amount of evidence and we've heard argument from both State of Indiana and from the defendant as to whether or not the death sentence should be imposed in this case. The State has the burden and has had the burden of proving beyond a reasonable doubt one or more of the aggravating circumstances which they have charged three, actually two under the statute but two counts of one. One of those aggravating circumstances is that the victim of the murder was a law enforcement officer acting in the course of duty. The other two counts relate to the defendant having been convicted of another murder. It's clear to the Court that the three counts charged in the death sentence information have been proved beyond a reasonable doubt. The question may lie as to whether or not the defendant knew that the victim, Officer Griffin, was, in fact, a law enforcement officer. I think the evidence is clear that Officer Griffin was a person not within the household and I think there's certainly reason to believe that the defendant did shoot a person outside the household, certainly through a door. There is conflicting testimony as to the action of the officer but I think there was certainly sufficient time and could have been sufficient action taken to determine for certain whether or not it was an officer. We have two patrol cars sitting in the driveway, marked with lights on the top. The statute does not require that the defendant knowingly murder a law enforcement officer acting in the line of duty but I think that this officer could have been identified; in fact, may have been identified as someone from outside the household and there certainly is some distinction between the brother-in-law, Mr. Caldwell, and Officer Griffin. But I think as the statute, its allegations as to aggravating circumstances, the Court has to conclude that those aggravating circumstances have been proved beyond a reasonable doubt. I think the Court has to look carefully to mitigating circumstances in this case that's been presented by the defense. It is my understanding and from my listening here to the evidence that the first contention is that the defendant was under the influence of extreme mental or emotional disturbance when he committed the murder. I think that the fact is there that he was under certainly some type of mental or emotional disturbance. What the difference between that disturbance, extreme or normal, the testimony has been substantial that there were a number of conflicts going on in the mind of the defendant. And certainly, there's been substantial testimony both from Dr. Widom and from Dr. Davis as well as from several other persons including the defendant that there was substantial mental and emotional disturbances at this time. The Court is concerned, I think there is some truth that in most events of this kind, there is a great deal of mental or emotional disturbance. Whether in other cases it arises to this level, I'm not certain. It's only this case that I can make a decision on. I think the other primary factor that was raised came under the mitigating circumstance shown as, say we say a general one, the other circumstances or circumstance appropriate for consideration. And I think that the circumstances there presented

were at sometimes moving to the Court, work that Richard performed, the defendant performed both prior to this event and after this event. The Court however must then, under our death penalty statute, attempt to determine whether or not the aggravating circumstances outweighed the mitigating circumstances or whether or not the mitigating circumstances outweighed the aggravating circumstances. That's been a difficult thing for this Court to resolve and perhaps that is as it should be and perhaps that is how it is for anyone whether it be a jury or a judge making that determination. The Court does believe that capital punishment in appropriate circumstances is a correct penalty. The question that is before this Court along with the basic issue of weight is, is it appropriate in this case? Do the, does the taking of three lives, one of which was a police officer acting in the line of duty outweigh the good works that have been testified to here as well as the mental stress that was upon the defendant at this time in question. I think there comes a time when a line has to be drawn and society has to say that it can not permit certain conduct to occur and when it does, that the most extreme penalty must be imposed. Mr. Moore, I think that in this situation, under the circumstances we've heard here in the last three days, that it is appropriate that the death penalty be imposed and that you be sentenced to die in the electric chair. For that reason, at this time, the Court does find the aggravating circumstances do outweigh the mitigating circumstances and at this time does set the date for your execution to be May the 1st, 1981 at an hour before sunrise."

I

Appellant first claims that the imposition of a death penalty in Indiana is improper and unconstitutional because Indiana's capital punishment scheme does not provide for an adequate proportionality review. We already have considered this contention at great length and have decided that Appellant is wrong on this issue. *Averhart v. State*, (1984) Ind., 470 N.E.2d 666, *reh. denied* (1985) [Issue XXIII]; *Resnover v. State*, Ind., 460 N.E.2d 922, *cert. denied* (1984) —— U.S. ——, 105 S.Ct. 231, 83 L.Ed.2d 160 [Issue I]; *Burris v. State*, (1984) Ind., 465 N.E.2d 171, *cert. denied* (1985) —— U.S. ——, 105 S.Ct. 816, 83 L.Ed.2d 809 [Issue X]; *Schiro v. State*, Ind., 451 N.E.2d 1047, *cert. denied* (1983) —— U.S.——, 104 S.Ct. 510, 78 L.Ed.2d 699 [Issue I]; *Williams v. State*, Ind., 430 N.E.2d 759, *appeal dismissed* (1982) 459 U.S. 808, 103 S.Ct. 33, 74 L.Ed.2d 47 [Issue I]; *Brewer v. State*, (1981) Ind., 417 N.E.2d 889, *cert. denied* (1982) 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384 [Issue III(B)]. *See also Pulley v. Harris*, (1984) 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29. We find no error on this issue.

II

Appellant next complains that the aggravating circumstances established by Ind. Code §§ 35–50–2–9(b)(8) and 35–50–2–9(b)(6) are unconstitutional. Of course, the Indiana death penalty statute dictates that "the [trial] court shall sentence the defendant to death only if it finds ... [t]hat the State has proved beyond a reasonable doubt that at least one (1) of the aggravating circumstances [defined in Ind.Code § 35–50–2–9(b)] exists." Ind.Code § 35–50–2–9(g)(1). This requirement imposed by our statute is to provide a "meaningful and principled basis" for distinguishing those murder cases for which death is imposed from all other cases in which death is not imposed. This requirement is to comply with the various holdings of the United States Supreme Court regarding capital cases. *See generally Zant v. Stephens*, (1983) 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235; *Godfrey v. Georgia*, (1980) 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398; *Proffitt v. Florida*, (1976) 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; *Gregg v. Georgia*, (1976) 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859.

## (A)

Ind.Code § 35–50–2–9(b)(8) reads as follows:

"The defendant has committed another murder, at any time, regardless of whether he has been convicted of that other murder."

We note that this Court already has held that this section of our criminal Code may not be applied in cases when the additional or aggravating homicide or "murder" is unrelated to the instant murder and has not been reduced to a conviction. *State v. McCormick*, (1979) 272 Ind. 272, 397 N.E.2d 276. That, of course, is not Appellant's situation since Appellant in fact was convicted in this case of three related murders. Appellant's case therefore is similar to *Judy v. State*, (1981) 275 Ind. 145, 416 N.E.2d 95, a multiple murder case wherein we found valid and applied Ind.Code § 35–50–2–9(b)(8).

Appellant, represented by the same appellate counsel who presented Judy's case to us in 1981, now argues that Ind.Code § 35–50–2–9(b)(8) cannot be constitutionally applied when more than one person is murdered in a "single episode" by a defendant acting under the influence of extreme mental or emotional distress. Specifically, Appellant contends that the killing of more than one person in a single event by a defendant acting under extreme mental or emotional distress is indistinguishable, in terms of the defendant's criminal culpability, from the killing of just one person which otherwise would not warrant a death sentence. Appellant cites only one case to support his argument, that case being *Godfrey, supra.*

Although the facts in Appellant's case are nearly identical to the facts surrounding the two murders in *Godfrey*, *Godfrey* does not control Appellant's case. This is because *Godfrey* pertains to aggravating circumstances and was decided upon the basis of an aggravating circumstance completely different from the aggravating circumstance now at hand. The aggravator in *Godfrey* was:

"The offense of murder ... was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim."

Ga.Code § 27–2534.1(b)(7) (1978). In *Godfrey*, the trial judge instructed the jury about this aggravating circumstance simply by reading the text of the statute. The United States Supreme Court found that practice unconstitutional since the language of § 27–2534.1(b)(7) did not impose "any inherent restraint on the arbitrary and capricious infliction of the death sentence" because "[a] person of ordinary sensibility could fairly characterize almost every murder" as falling within the language of § 27–2534.1(b)(7). *Godfrey*, 446 U.S. at 428–429, 100 S.Ct. at 1765, 64 L.Ed.2d at 406. The Court accordingly vacated the death sentence in *Godfrey* because the trial court had failed to "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" *Id. Godfrey* therefore stands for the point of law that to pass constitutional muster, an aggravating circumstance must be "considerably more specific or objectively measureable than § [27–2534.1](b)(7)" which, by itself, provided "no principled way to distinguish [cases] in which the death penalty was imposed from the many cases in which it was not." *Godfrey*, 446 U.S. at 423 [footnote 2], 433, 100 S.Ct. at 1762, 1767, 64 L.Ed.2d at 403, 409.

■ *Godfrey* does not, as Appellant suggests, hold that multiple murders committed as they were in *Godfrey* can never be punished by death regardless of the aggravating circumstances used to qualify them for a possible death sentence. We note the following excerpt from *Godfrey:*

"Thus, the validity of the petitioner's death sentences turns on *whether, in light of the facts and circumstances of the murders that Godfrey was convicted of committing, the Georgia Supreme Court can be said to have applied a constitutional construction of the*

phrase 'outrageously or wantonly vile, horrible or inhuman in that [they] involved ... depravity of mind....' [footnote omitted] We conclude that the answer must be no. The petitioner's crimes cannot be said to have reflected a consciousness materially more 'depraved' than that of any person guilty of murder. His victims were killed instantaneously. [footnote omitted] They were members of his family who were causing him extreme emotional trauma. Shortly after the killings, he acknowledged his responsibility and the heinous nature of his crimes. These factors certainly did not remove the criminality from the petitioner's acts. But, as was said in *Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197 [1204], 51 L.Ed.2d 393, it is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.'

That cannot be said here. *There is no principled way to distinguish this case,* in which the death penalty was imposed, from the many cases in which it was not."

*Godfrey,* 446 U.S. at 432–433, 100 S.Ct. at 1767, 64 L.Ed.2d at 409 (emphasis added). We do not understand this language to support Appellant's position that his crimes were, by their nature, constitutionally ineligible for death but rather believe that the language demonstrates the Supreme Court's point that Georgia's "depravity of mind" standard was not specific enough to provide an adequate basis by which to properly distinguish Godfrey's case from any other murder case. After all, every murder constitutes a "depraved" act. The rationale behind the statutory requirement that death sentencing be done only in consideration of a set of certain, specific aggravating circumstances is that the aggravating circumstances proffered by the General Assembly provide a "meaningful and principled basis" by which to qualitatively measure the relative depravity of a specific murder. "Aggravation", of course, means "[a]ny circumstance attending the commis-sion of a crime ... which increases its guilt or enormity or adds to its injurious consequences." *Black's Law Dictionary* 60 (5th ed. 1979). The finding of an aggravating circumstance therefore facilitates a comparison between different murders so as to identify and distinguish, in a reasonable manner, the *most* depraved murders which society believes should be punished by the most severe penalty. Moreover, in this way society insures that death sentences are not imposed in an "arbitrary and capricious" fashion. The finding of specific aggravating circumstances is important also because it further serves to enlighten the defendant and the community as to the justification behind the particular death sentence imposed, thereby greatly bolstering the public's confidence in the fairness and justice of our State's judicial process. We now find that Ind.Code § 35–50–2–9(b)(8) is "considerably more specific or objectively measurable" than the aggravating circumstance unconstitutionally applied in *Godfrey.* Accordingly, we rest upon our holding in *Judy* and find no error on this issue.

(B)

■ Appellant also challenges the constitutionality of Ind.Code § 35–50–2–9(b)(6) which reads:

"The victim of the murder was a corrections employee, fireman, judge, or law-enforcement officer, and either (i) the victim was acting in the course of duty or (ii) the murder was motivated by an act the victim performed while acting in the course of duty."

In challenging this code section, Appellant would have us decide his case on the basis of some abstract, hypothetical case which we will not do. This is to say that Appellant's case does not present us with the problem of deciding whether Ind.Code § 35–50–2–9(b)(6) can constitutionally be applied when the murderer had no way of knowing that his victim was a law enforcement officer. To put it another way, this is not the situation of an undercover police officer whose intent and effect was to dis-

guise his special identity. That situation may have to be decided upon in the future, however, Appellant's case clearly falls within the ambit of our ruling in *Resnover, supra. See also Averhart, supra.* [Issue XXI]. In *Resnover,* we found no merit to the contention that "Ind.Code § 35–50–2–9(b)(6) justifies a death sentence which is grossly disproportionate to the severity of punishment justified for murder since said standard of aggravation does not require that the murderer know of his victim's special status when committing the murder." *Resnover,* 460 N.E.2d at 930. We so found because "the facts adduced at trial clearly show that [Resnover and his cohorts] ... knew that the men at their door were police officers when they commenced firing upon them." *Id.* In Appellant's case, Appellant either knew or reasonably should have known that the person standing in the doorway of the Caldwell home was a police officer. After all, Appellant himself testified that he "looked out ... and there was a face and a gun." It surely is reasonable to presume that if Appellant could see the victim's face and the gun being held in the victim's hand at waist level, then Appellant could and should have at least noticed the upper half of the victim which indicated the victim's special identity. We again note that the victim, Officer Griffin, was wearing his official and distinctively marked uniform with a badge and radio clipped to the front of his shirt. Moreover, we have the eyewitness testimony of Officer Atwood that Officer Griffin "knocked on the door, he was standing there and ... he went into a crouch, his weapon coming up and he said, 'hey man, don't do it' ". We also note the testimony of Assistant Deputy Chief Mukes who recounted how Appellant shot him just as he stepped out of his clearly marked police vehicle while wearing his official uniform. This testimony obviously shows that Appellant had the ability, if not the predisposition, to consciously shoot, if not kill, a police officer. This, of course, is pertinent to Appellant's claim that he was physically handicapped such that he could not perceive who his victim was. All of this evidence clearly established that Appellant had the ability and a timely opportunity to ascertain that his victim was a law enforcement officer acting in the course of his duty. In other words, Appellant reasonably could and should have known that Griffin was a police officer which is what we impliedly found in *Resnover* when we determined that Resnover "knew" he was directing his deadly gunfire upon police officers. To not utilize this reasonable discernment test would effectively void many of our criminal law precepts and invite disaster as murders would always excuse themselves by claiming that they shot before they cognitively thought about the status of their victims. Furthermore, we believe that Appellant forfeited his standing to complain that he did not know that his potential victim was a police officer when Appellant did not take advantage of the opportunity he had to become so informed. Appellant cites us no authority dictating otherwise and we will not decide this case merely on the basis of his abstract arguments. There is no error here in the application of Ind.Code § 35–50–2–9(b)(6). We note that even if this aggravator were found unconstitutional as applied in Appellant's case, Appellant's death sentence would still be valid on the basis of the two counts of the one aggravating circumstance we found valid in Issue II(A).

### III

■ Appellant next challenges the sufficiency of the evidence supporting the trial court's finding that he had murdered a police officer who was acting in the course of his duty. Of course, this finding was the basis upon which the trial court aggravated Appellant's murder conviction pursuant to Ind.Code § 35–50–2–9(b)(6) and imposed a death sentence. It is well-settled that when reviewing the sufficiency of evidence, this Court will neither reweigh the evidence nor determine the credibility of the witnesses. *Randall v. State,* (1985) Ind., 474 N.E.2d 76, *reh. denied.* We already have set forth above a detailed rendition of the pertinent facts of this case. Considering those facts, we find no error.

IV

We note at the outset that the United States Supreme Court has held that the Eighth and Fourteenth Amendments to the United States Constitution require a sentencing trial court to consider "the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispersable part of the process of inflicting the penalty of death." *Woodson v. North Carolina,* (1976) 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944, 961 [plurality opinion]. *See also Eddings v. Oklahoma,* (1982) 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1; *Lockett v. Ohio,* (1978) 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 [plurality opinion]. Indiana's death sentencing scheme comports with these holdings as it allows the sentencing trial court to consider as a mitigating circumstance "any other circumstance appropriate for consideration." Ind.Code § 35–50–2–9(c)(7). This "catch-all" mitigator, in addition to the six mitigating factors explicitly stated in Ind. Code §§ 35–50–2–9(c)(1) through 35–50–2–9(c)(6), enables the trial court to consider as a mitigating circumstance in capital cases any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for imposing a sentence less than death. The Indiana death sentencing statute therefore provides for the individualized consideration of mitigating factors required by the United States Supreme Court. We also note that there is in Indiana a set of rules for the appellate review of sentences which precludes any change in a sentence by an appellate court except when a sentence "is manifestly unreasonable in light of the nature of the offense and the character of the offender." Ind.R. App.Rev.Sent. 2(1). This Court has held that this rule applies to our appellate review of death sentences. *Resnover, supra; Daniels v. State,* (1983) Ind., 453 N.E.2d 160, *reh. denied; Schiro, supra; Williams, supra.* Appellant now claims that the trial court erred by failing to consider three particular mitigating circumstances in his case.

(A)

Appellant first alleges that the trial court erred by failing to consider the mitigating circumstances set forth by Ind. Code § 35–50–2–9(c)(1) which follows:

"The defendant has no significant history of prior criminal conduct."

Appellant also contends that the trial court erred by failing to find that he in fact had no significant history of prior criminal conduct. The State counters by contending that the facts indicated by the record and generally admitted by Appellant support the finding that Appellant did have a significant history of prior criminal conduct even though his prior criminal conduct either was disposed of with leniency or was not prosecuted. Notwithstanding how his prior cases were handled, Appellant's history as he himself presented it included two examples of Appellant electing, as the State puts it, "to have his guns do his talking for him." The first situation occurred in 1966 when Appellant and a friend named "Big Moe" Mosley got into a fight over a woman. According to Appellant's own testimony, Mosley threatened Appellant whereupon Appellant got his shotgun and confronted Mosley with it. The incident ended in a struggle over the gun and Appellant shot Mosley in his leg. Mosley subsequently declined to prosecute so the criminal charges against Appellant were dismissed. The second similar use of a gun by Appellant involved one of Appellant's former neighbors, Mrs. Donna Besly. Mrs. Besly testified during Appellant's sentencing hearing that Appellant telephoned her at home one evening in 1974 and asked her to meet him in a tavern for a drink. After she told him to "go jump in the lake" and hung up, Appellant called a second time and again was rejected. Appellant shortly thereafter went to Mrs. Besly's home, burst through her back door "like a ton of bricks", pulled out a "large gun" and expressed his displeasure over the fact that she was the foreperson of a federal grand jury which had just summoned one of his good friends. Appellant subsequently was

convicted of a misdemeanor violation of the 1935 Firearms Act and was fined $9.00 plus costs. Both of these events, in addition to Appellant's 1968 conviction for shoplifting $24.84 worth of merchandise, represent prior criminal conduct which is significant to Appellant's case since both events demonstrate Appellant's propensity to use a gun to settle disputes or to impose his will on others. The fact that Appellant had this history of reacting to rejection or hostility by arming himself before confronting his adversary is most significant to the trial court's consideration of Appellant's nature and the nature of his instant crimes. Accordingly, we find that the sentencing trial court was justified in concluding that Appellant had a significant history of prior criminal conduct which was pertinent to the convictions for which Appellant was being sentenced. The trial court therefore did not err by not finding a mitigating circumstance in Appellant's case pursuant to Ind. Code § 35–50–2–9(c)(1). Moreover, the trial court was not obliged to discuss Ind. Code § 35–50–2–9(c)(1) when found inapplicable to Appellant's case.

### (B)

Appellant next alleges that the trial court erred by failing to find that Appellant was "under the influence of extreme mental or emotional disturbance when he committed the murder[s]", a mitigating circumstance pursuant to Ind.Code § 35–50–2–9(c)(2). We note that the trial judge indicated in his findings upon sentencing that he had considered Appellant's mental and emotional condition at the time Appellant perpetrated the instant three murders. Specifically, the trial judge found that Appellant was under "some kind" of mental or emotional distress as suggested by the "substantial" testimonies of Doctor Widom, Doctor Davis and "several other persons including the defendant." While the trial judge found that this mitigator applied to some extent in Appellant's case, the trial judge also had the responsibility to attribute a weight to this mitigator to be able to balance this mitigator, in conjunction with any other mitigators he found, against

the aggravators he found in Appellant's case. This the trial judge did. Appellant now would have us reweigh the testimonies presented to the trial court and conduct a second balancing of the aggravating and mitigating circumstances to find in his favor. This we will not do. There was ample evidence to support the trial court's conclusion which the trial court properly explained in its sentencing findings. We find no error.

### (C)

With regard to mitigating circumstances, Appellant lastly argues that trial court erred by failing to find as mitigating circumstances certain "other circumstances appropriate for consideration." Ind.Code § 35–50–2–9(c)(7). In particular, Appellant contends that the trial court should have found that the following three factors constituted mitigating circumstances in his case:

1) the improvement Appellant made in his life as he overcame his alcoholism;
2) the beneficial aspects of Appellant's religious activities in jail; and
3) certain opinion evidence that Appellant would not be likely to repeat the instant crimes.

Once again Appellant merely reargues the factual issues in his case and implores us to reweigh the evidence to find in his favor. This we will not do. The trial court specifically remarked about its consideration of the first two of the above listed factors in its findings upon sentencing. Although the trial court did not mention the third factor raised by Appellant, we may reasonably presume that the trial court regarded the opinion evidence about Appellant's future conduct as speculative and incredible or as refuted by the evidence of Appellant's prior criminal conduct. Notwithstanding its reason, the trial court is not required to discuss every piece of evidence presented to it or to state the weight or credibility it attributes to every witness' opinion.

In this case, the trial court's findings clearly demonstrate that the trial

court made an individualized consideration of Appellant's crimes and of Appellant's character. The record shows that the trial court accepted certain of the mitigating circumstances suggested by Appellant but found that those circumstances were not of sufficient mitigating value to render the imposition of the death penalty unreasonable. Based on the record, we do not find that Appellant's death sentence was imposed in an arbitrary or capricious manner. Moreover, we do not find that the imposition of death in Appellant's case was unreasonable. There is no error on this issue.

V

Appellant next contends that the death sentence was unconstitutionally imposed in his case because the trial court admitted, over his objection, inadmissible evidence during his sentencing hearing. During Appellant's guilty plea hearing, Officer Minor, the homicide detective assigned to collect evidence and investigate the instant murders, testified about what others had told him about the murders. Moreover, written reports prepared by two court-appointed psychiatrists who did not testify in court also were admitted into the record. All of these out of court statements were offered, with Appellant's approval, to establish a factual basis to support Appellant's guilty pleas. Although Appellant did not make any objection to the admission of this purely hearsay evidence during the guilty plea hearing, Appellant objected on the grounds of hearsay and insufficient reliability of the evidence when the State subsequently motioned to incorporate all of the evidence from the guilty plea hearing into the record of the sentencing hearing. The trial court overruled the objection and Appellant now urges that admission of the hearsay evidence from the guilty plea hearing into the sentencing hearing violated his right to confront adverse witnesses thereby rendering his death sentence unconstitutional.

Appellant concedes that hearsay evidence is admissible in guilty plea proceedings but argues that the customary rules of evidence and the requirements of the Sixth Amendment Confrontation Clause, as applied to the individual states by the Fourteenth Amendment, excludes such evidence during a sentencing hearing unless it falls within some established exceptions. We do not agree. It is a well-established rule that when a valid guilty plea is entered, the defendant waives many constitutional rights including the right to confront his accusers. *Boykin v. Alabama*, (1969) 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (acknowledging waiver of constitutional right to confront one's accusers—reversing on other grounds); *Pointer v. Texas*, (1965) 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923; *Anderson v. State*, (1975) 263 Ind. 583, 335 N.E.2d 225 (reversing on other grounds); *Williams v. State*, (1975) 263 Ind. 165, 325 N.E.2d 827. Appellant nonetheless cites to several United States Supreme Court decisions which oblige the States to observe fundamental constitutional guarantees during the sentencing hearing. *Estelle v. Smith*, (1981) 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359; *Presnell v. Georgia*, (1978) 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207; *Gardner v. Florida*, (1977) 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393; *Pointer, supra*. Not one of the decisions to which Appellant refers us, however, entails a guilty plea since all of the cases involve trials on the merits. As aforementioned, a defendant waives many of his fundamental constitutional rights upon entering a plea of guilty. Thus, the cases Appellant cites can be distinguished on the basis that they entailed full trials, not guilty pleas involving a waiver of many fundamental rights, and are thus inapplicable here. We also do not agree with Appellant's argument that he can waive his Sixth Amendment right for the purpose of the guilty plea hearing while simultaneously preserving the right to confront his accusers during the sentencing hearing. As the State points out, the Supreme Court of the United States in *Gregg, supra,* upheld Georgia's Death Penalty Statute as constitutional and approved Georgia's procedure of allowing evidence considered during the guilt stage to be considered during the sentencing stage without being resubmit-

ted. Appellant claims *Gregg* is inapplicable here because Appellant Gregg was advancing an Eighth and Fourteenth Amendment challenge, not a Sixth Amendment challenge. We do not agree because the United States Supreme Court explicitly listed this procedure, *inter alia*, to show that Georgia's capital punishment scheme adequately safeguarded against the arbitrary and capricious imposition of the death penalty. Although *Gregg* did not involve a guilty plea, a footnote to the statement in *Gregg* that evidence considered during the guilt stage may be considered during the sentencing stage without being resubmitted nonetheless reads as follows:

> "Essentially the same procedures are followed in the case of a guilty plea. The judge considers the factual basis of the plea, as well as evidence in aggravation and mitigation. *See Mitchell v. State* [(1975)] 234 Ga. 160, 214 S.E.2d 900, [*cert. denied,* (1976) 428 U.S. 910, 96 S.Ct. 3224, 49 L.Ed.2d 1219.]"

*Gregg,* 428 U.S. at 164, 96 S.Ct. at 2921, 49 L.Ed.2d at 869 [Footnote 8]. Thus, we do find support in *Gregg* for our determination that the Sixth Amendment was not violated by the incorporation of evidence from the guilty plea hearing into the record of the sentencing hearing.

Appellant also has failed to demonstrate any prejudicial harm due to the trial court's consideration of the guilty plea hearing evidence when determining Appellant's sentence. Appellant's first allegation of prejudicial harm is that Officer Minor stated during the guilty plea hearing that Officer Atwood had reported to him that Officer Griffin was wearing his police uniform and hat upon approaching the Caldwell house. At the sentencing hearing Officer Atwood testified Griffin had his uniform on but not his hat. Regardless of whether the trial judge was aware of the discrepancy in this testimony, there was overwhelming circumstantial evidence to show that Appellant knew or reasonably should have known that he was shooting an officer in the line of duty even without evidence that Griffin was or was not wearing his hat. Consequently, the testimony

regarding Griffin's hat was of such inconsequential value that no prejudice can have been shown. Appellant next claimed harm with regard to Officer Minor's testimony at the guilty plea hearing about what Ruth Caldwell, the sole survivor, told him regarding the shooting. Minor related from his interview with Ruth Caldwell that Appellant shot her once, left, returned, said "Aren't you dead yet, bitch?", and then shot her again. Appellant claimed this was not true at the guilty plea hearing, and now claims that the trial judge's consideration of this evidence at the sentencing hearing tended to damage his proof of the mitigating circumstance of "extreme mental or emotional disturbance" under Ind.Code § 35-50-2-9(c)(2). Appellant fails, however, to show prejudicial harm by merely arguing that this evidence was improperly incorporated into the sentencing hearing. The statement of Ruth Caldwell was contained in the presentence report and consideration of this report in the sentencing phase has been sanctioned by this Court as well as by the United States Supreme Court. *Williams v. New York,* (1949) 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337; *Lottie v. State,* (1980) 273 Ind. 529, 406 N.E.2d 632. In *Williams,* the United States Supreme Court stated:

> "... modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial."

*Williams,* 337 U.S. at 247, 69 S.Ct. at 1083, 93 L.Ed. at 1342. However, it is imperative that the defendant be given the opportunity to rebut any and all of the matters contained in the pre-sentence report. Ind. Code § 35-50-2-9(d). This Appellant was allowed to do and Appellant did deny making the statement in question at the guilty plea hearing. Additionally, Appellant waived his right to confront his accusers when he decided to plead guilty. Consequently, he could take exception to Ruth Caldwell's statement at the guilty plea and

sentencing hearing, but the determination of which version to believe, if either, was solely for the trial court to determine. Therefore, Appellant's Sixth Amendment right was not violated in this instance and Appellant has not shown that he was prejudicially harmed. Appellant next urges he was prejudiced because the written reports of the two court-appointed psychiatrists were included in the guilty plea hearing and incorporated in the sentencing hearing. He claims the doctors' opinions could have been interpreted as contrary to Appellant's evidence of the mitigating circumstance that he was operating under extreme mental or emotional disturbance at the time of the shootings. Although neither doctor testified at either hearing, Appellant did present two expert witnesses of his own who testified that Appellant was under such a disturbance at the time of the shootings. Thus, Appellant was afforded his right to rebut evidence produced at the sentencing hearing and, because he waived his right to cross-examine his accusers, no prejudice can have come to him by reason of his not being able to question the court-appointed psychiatrists. Further, upon review of the record, it is apparent that both court-appointed psychiatrists' opinion supported Appellant's position that he was operating under extreme mental or emotional disturbance during the shooting although they did not support the insanity defense which Appellant contemplated pleading before deciding to enter a guilty plea. Accordingly, Appellant has shown no prejudice by this specific instance. No error has been shown by this issue.

## VI

Appellant lastly argues that Indiana's death penalty statute, Ind.Code § 35–50–2–9, is unconstitutional on its face and as applied in this case because it does not "require the [trial] court to find that any mitigating circumstances were outweighed by the aggravating circumstances beyond a reasonable doubt." Ind.Code § 35–50–2–9(g) reads in pertinent part as follows:

"If the hearing is to the court alone, the court shall sentence the defendant to death only if it finds: (1) That the State has proved beyond a reasonable doubt that at least one of the aggravating circumstances exists; and (2) That any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances."

The State concedes that the United States Constitution protects an accused against criminal conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, (1970) 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 375. In *Daniels, supra*, we found that Ind.Code § 35–50–2–9(g) complies with the proscription articulated in *Winship* since the State must prove *beyond a reasonable doubt* the existence of at least one of the enumerated aggravating circumstances. Moreover, we specifically decided upon Appellant's argument as follows:

"However, the determination of the weight to be accorded the aggravating and mitigating circumstances is not a 'fact' which must be proved beyond a reasonable doubt, but is a balancing process."

*Daniels*, 453 N.E.2d at 171. Appellant now suggests that this language was *dicta* because *Daniels* involved a jury trial in which the jury was instructed to follow the "beyond a reasonable doubt" standard in finding the existence of aggravating factors and in the weight determination implicit in the requisite balancing process. Notwithstanding this distinction, we expressly adopt the language of the above quoted passage from *Daniels* and hold that it is constitutional to not require a finding that aggravating factors outweigh mitigating circumstances beyond a reasonable doubt.

The United States Supreme Court approved a Florida statutory protocol in which the jury, after finding guilt, retires a second time to consider whether aggravating circumstances exist and to consider mitigating factors as against the aggravating circumstances. The procedure dictated by the approved Florida statute neither re-

quired that the balancing nor the determination of aggravating circumstances be proved beyond a reasonable doubt. *Proffitt, supra.* Ind.Code § 35–50–2–9(g), of course, requires that the aggravating circumstances be proved beyond a reasonable doubt which affords a greater degree of protection to the defendant than that provided by the statutory scheme approved in *Proffitt.* Further, the United States Supreme Court has explicitly declined to instruct a state court on how to weigh the evidence in mitigation against the evidence in aggravation so long as the state court fulfills the duty to "consider all relevant mitigating evidence and weigh it against the evidence of the aggravating circumstances." *Eddings,* 455 U.S. at 117, 102 S.Ct. at 878, 71 L.Ed.2d at 12. Although Appellant argues that the United States Supreme Court did not address his precise issue in either *Proffitt* or *Eddings,* we nonetheless believe that these cases lend support to our rejection of Appellant's argument.

█ Finally, Appellant argues that even if the weighing of mitigating and aggravating circumstances is not governed by a "beyond a reasonable doubt" standard, the trial judge erred by stating that his responsibility was to determine whether the aggravating circumstances outweighed the mitigating ones or whether the mitigating circumstances outweighed the aggravating ones. Appellant specifically asserts that the trial court erred by not recognizing and stating a third possible situation in which the death penalty could not be imposed, namely: the aggravating circumstances weighed the same as the mitigating ones. As the State properly points out, however, whether the trial court's remarks amounted to a misstatement of law which might have some effect in a hypothetical situation is not pertinent to our consideration of Appellant's case. The trial court specifically held that, "... the Court does find the aggravating circumstances do outweigh the mitigating circumstances...." By the trial court's judgment, the death sentence was imposed on a proper finding of the relative weight of the aggravating

and mitigating circumstances. Consequently, Appellant has presented no error by this issue.

In concluding our review of the imposition of a death penalty in this case, we find that the trial court carefully followed all of the required and approved statutory procedures pertaining to death penalties. At Appellant's sentencing hearing, both Appellant and the State presented evidence and argument which the trial court considered before imposing the death penalty. The trial judge entered a thorough written statement of findings and reasons for his imposition of a death penalty which shows that the trial judge considered both the specific facts of the instant crimes and Appellant's character. We have reviewed the trial judge's written findings and reasons along with the evidence in the case and find that the record clearly supports the trial judge's conclusion that the imposition of a death penalty for Appellant's three murder convictions was justified by the nature of the offenses and by the character of the offender. Moreover, the evidence supports our conclusion that Appellant's death sentence was not arbitrarily or capriciously arrived at and is not manifestly unreasonable.

The judgment of the trial court is affirmed in all things. This cause is remanded to the trial court for the purpose of setting a date for Appellant's death sentence to be carried out.

GIVAN, C.J., and PRENTICE, J., concur.

DeBRULER, J., dissents with separate opinion.

HUNTER, J., not participating.

DeBRULER, Justice, dissenting.

One of the aggravating circumstances upon which the State based its request for the death penalty was Ind.Code § 35–50–2–9(b)(6). That provision provides:

"The victim of the murder was a correction employee, fireman, judge, or law enforcement officer, and either (1) the victim was acting in the course of duty,

or (ii) the murder was motivated by an act the victim performed while acting in the course of duty."

The policy at the base of the exercise of the police power here is to create a special deterrence to the direction of physical force against police officers and others upon whom the security of the community depends. There are at least two essential states of mind referred to in the provision, the one required for murder plus an awareness of the official status of the target. The first is within the meaning of the term "murder" and the second is within the special official status terms. The purpose of the statute restricts it to instances in which the attacker knows he is dealing with one of the enumerated officials. Such knowledge of official status must be actual. Actual knowledge is, I am convinced, intended by the legislature. Moreover, my personal vote as Justice of this court concurring in *Resnover v. State* (1984), Ind., 460 N.E.2d 922, was based upon the existence of this statutory requirement of actual knowledge of the official status of the victim and carried with it no implication, as did apparently the votes of the other members of the court, that this statutory provision was intended to permit those committing murder to be subject to the death penalty if they were confronted with circumstances from which a reasonable man could discern official status. I consider the reasonable discernment test applied by the majority to be contrary to legislative intent and basic precepts of criminal law governing standards to select those who deserve death as a penalty for crime.

There is no recitation in the record of the sentencing hearing that the sentencing court did find beyond a reasonable doubt as trier of fact, that appellant, at the time he shot and killed this police officer, did know that he was shooting at a police officer. An application of the above quoted aggravating circumstance provision in my view requires that finding. The recitation of the sentencing court is in fact susceptible of being viewed as one reflecting an inability to find this fact beyond a reasonable doubt. Furthermore, the record discloses that this

aggravating circumstance provided part of the total positive value of aggravating circumstances, found to have greater weight than mitigating circumstances, in the final step of the death sentencing process conducted pursuant to Ind.Code § 35–50–2–9(e). Since the finding on that aggravating circumstance was based upon a false legal premise, ie, that appellant need not have had actual knowledge of official status, it cannot be permitted to provide part of that countervailing weight which may outweigh the net positive value of mitigating circumstances. Upon the basis of the foregoing analysis of this case, I would set aside the death sentence and order a new sentencing hearing.