James Allen HARRIS, Appellant,

v.

STATE of Indiana, Appellee.

No. 784S270.

Supreme Court of Indiana.

Nov. 5, 1986.

Rehearing Denied Feb. 5, 1987.

Kenneth M. Stroud, Michael T. Conway, L. Craig Turner, Quill Boberschmidt, Miller & Turner, P.A., Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-Appellant James Harris entered the plea of "Guilty But Mentally Ill" to murder, kidnapping, and rape, on November 30, 1983. The trial court, after conducting a hearing to make a factual determination that sufficient evidence existed for the pleas, accepted the pleas on December 15, 1983. After taking the matter under advisement, the trial court pronounced judgment on February 10, 1984, sentencing Appellant to death. He now directly appeals and raises the following issues:

1. whether the trial court's imposition of the death penalty after accepting the plea of "Guilty But Mentally Ill, violated a statutory right to treatment and the Eighth Amendment prohibition against cruel and unusual punishment;

2. whether there was sufficient evidence to support a finding of intentional killing, as such was used to justify the imposition of the death penalty;

3. whether the death penalty statute, Ind. Code § 30–50–2–9 (Burns 1985), is unconstitutional for not requiring the trial court to find aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt; and

4. whether there was sufficient evidence to support the finding that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

Appellant testified to the following facts at a hearing to determine a factual basis for his plea. On March 28, 1983, Jane Brumblay was preparing to get into her car at Glendale Shopping Mall as Appellant came around the rear of the car. They both were startled. Brumblay, apparently having seen Appellant in another car, questioned his behavior and threatened to report him. Appellant then argued with her, overpowered her, and forced her into her car. There, he removed her pantyhose and used them to tie her hands behind her back. He then drove to a theater parking lot and raped the victim more than once. The victim managed to free her hands and began scratching and struggling with Appellant. Appellant reacted by pulling the victim's scarf around her neck, strangling her until he realized she was not able to breathe. When he observed she had reached a state of semi-consciousness, he loosened the scarf, placed it in her mouth and retied her hands. He then drove to Broad Ripple Park and stopped to check the gagged victim, who, by that time, had swallowed part of the scarf. Appellant was frightened when he discovered the victim's heart had stopped beating. He then placed her body in the trunk of her car and abandoned the car in a grocery store parking lot.

At the guilty plea hearing, Appellant and Hanus J. Grosz, the defense psychiatrist, introduced for the first time the theory that Appellant felt controlled by psychic forces. Dr. Grosz testified that Appellant was a psychotic who operated under a delusional system wherein "karmic controllers" had given him the mission to humiliate white women by raping them. Despite this, Dr. Grosz testified Appellant was aware that society held this conduct to be wrong and that, as a result, he was in conflict with society. Appellant's testimony also indicated he went beyond these

psychic controllers' commands when he strangled the victim, and that he had not been ordered to kill.

The State strongly urged that Appellant's "karma scheme" was concocted, and that for a significant amount of time after Appellant's arrest, no mention was made of a higher power commanding him to act in a certain manner. Dr. Dwight Schuster, a court appointed psychiatrist, testified he had interviewed Appellant and submitted a report on August 13, 1983, at which time Appellant had made no mention of "karmic controllers" or any delusional scheme. However, when Dr. Schuster again interviewed Appellant on November 28, 1983, Appellant's story had changed significantly to include these compelling sources. Dr. Schuster invoked the aid of psychologist Paul Fredrickson to test his suspicion that Appellant's changed story was not due to his truly having operated under a delusional system. After Fredrickson conducted several tests, unaware of Dr. Schuster's reasons for the tests, Fredrickson offered the opinion that Appellant's references to karmic controllers was not, in fact, attributable to a delusional disorder emanating from a mental illness. Dr. Schuster's original diagnosis, that Appellant suffered from a personality disorder of an antisocial type, remained unchanged.

During the statutory hearing for determining imposition of the death penalty, Pathologist Edward Wills testified that the cause of death was due to manual strangulation and not from the victim swallowing her scarf.

## I

Appellant received the death penalty for having intentionally killed Jane Brumblay while committing rape and kidnapping. The first issue Appellant raises emanates from his voluntary plea of guilty but mentally ill, pursuant to Ind.Code § 35-35-2-1(a)(3)(C) (Burns 1985). Appellant now claims this statute created a right to treatment for him when he entered his plea, but this right to treatment was violated when the death penalty was imposed.

Further, Appellant argues that imposition of the death penalty upon a defendant found to have been suffering from a mental illness to a degree to satisfy a guilty but mentally ill conviction is excessive, and thus in violation of the Eighth Amendment prohibition against cruel and unusual punishment.

Appellant's plea read, in part, as follows: "... 9. The defendant further acknowledges that if this plea of guilty but mentally ill is accepted by the Court 'the Court shall sentence him in the same manner as a defendant found guilty of the offense' [Ind.Code § 35-36-2-5(a)] and *the Court could decide to impose the death sentence* as requested by the State of Indiana in a separate Information filed on August 1, 1983, or could sentence him in any manner provided by law. The defendant further acknowledges that it is unclear whether the Court may impose the death sentence in the event the Defendant's plea of guilty but mentally ill is accepted by the Court." (Emphasis added.)

We do not agree with Appellant's conclusion that Ind.Code § 35-36-2-5 gives him a right to treatment that would be foreclosed by imposition of the death penalty. Ind. Code § 35-36-2-5 (Burns 1985) states, in part, as follows:

"Sentencing of defendant found guilty but mentally ill.

(a) Whenever a defendant is found guilty but mentally ill at the time of the crime, or enters a plea to that effect that is accepted by the court, the court shall sentence him in the same manner as a defendant found guilty of the offense.

(b) If a defendant who is found guilty but mentally ill at the time of the crime is committed to the department of correction, *he shall be further evaluated* and then treated in such a manner as is psychiatrically indicated for his mental illness." (Emphasis added.)

Notably, Ind.Code § 11-10-4-2 also provides that the Department of Corrections shall provide care and treatment for *every* person committed who is found to be men-

tally ill. Ind.Code § 35–36–2–5(b) provides that a person committed in a status of guilty but mentally ill shall be further evaluated and treated in such a manner as is psychiatrically indicated for his mental illness. This does not affect his guilt in committing the crime, nor does it affect the penalty imposed because of it. Appellant acknowledged this in the entry of his guilty plea. By his arguments, Appellant would have us equate the plea or status of one mentally ill with that of one who pleads or is found to be not guilty by reason of insanity. These are vastly different situations. There is no inference in this record, nor does Appellant claim, that he lacked responsibility for his acts because he was insane, that he was unable by reason of his mental condition to form an intent to commit the crime, or that he was unable to conform his conduct to the standards and laws of society.

This Court found, in *Truman v. State* (1985), Ind., 481 N.E.2d 1089, that a plea of guilty but mentally ill, in reality, adds nothing to a finding of guilty. We further concluded that mental illness was not, nor had it ever been, a defense to a crime in Indiana.

"The present statute Ind.Code § 35–36–2–5 in reality adds absolutely nothing to a finding of guilty. It is of no consequence whatever that the jury or a judge finds a person mentally ill at the same time they find him to be guilty." *Id.* at 1090.

In *Truman*, we did find there was confusion in the mind of the defendant when he entered his plea of guilty but mentally ill, in that he did not fully understand the plea and the consequences of it. We found in that case that the plea possibly could have been unknowing and involuntary because he was misled as to the effect of his plea.

Such is not the case here. Appellant expressly stated he fully understood the plea, and understood he would receive the same sentence and penalty as a defendant found guilty of the offense. He acknowledged that the court could decide to impose the death sentence, but then stated it was unclear whether the court would do so in the event his plea was accepted. This illustrated a full understanding of the plea and the risk Appellant was taking in entering it, and, of course, his willingness to strategically take that risk.

Rather than give a right to treatment, the statute merely affords the opportunity of a defendant to receive necessary psychiatric treatment while his sentence is being carried out "in such a manner as is psychiatrically indicated for his mental illness." Ind.Code § 35–36–2–5(b) (Burns 1985). There is no showing here that Appellant even requires psychiatric treatment. As the fact situation set out above indicates, his claim that he was directed to humiliate white women was not presented until the sentencing hearing, and was refuted by many of the other witnesses. Appellant, himself, testified that the "karma forces" did not order him to kill anyone, and his expert witness, Dr. Grosz, testified that Appellant was aware that society held his conduct to be wrong and that, as a result, he was in conflict with society.

Appellant further argues that to impose the death penalty here would be cruel and unusual punishment since the Court found, pursuant to Ind.Code § 35–36–1–1, that Appellant was, at the time of the crime, suffering "a psychiatric disorder which substantially disturbs a person's thinking, feeling, or behavior, and impairs the person's ability to function." Appellant claims that if a person is suffering this severe a degree of mental illness, he should not be held accountable or penalized in the same manner as any other criminal admitting criminal culpability. Here, again, counsel would have us equate Appellant's status with that of one found to be insane. There is no showing here that Appellant was, by reason of any mental condition, unable to form an intent to commit the crime, or to conform his conduct to the law. As we have indicated, the evidence is to the contrary.

In further support of his contention that his death sentence is an excessive punishment, Appellant cites *Coker v. Georgia*

(1977), 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982, wherein the United States Supreme Court held the death penalty was an excessive punishment for the crime of rape. The holding in *Coker,* however, is not analagous to this case. Appellant was found guilty here, not only of rape, but of willful murder in the commission of rape. The United States Supreme Court held in *Gregg v. Georgia* (1976), 428 U.S. 153, 187, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859, 882, U.S. *reh. denied* (1976), 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158, that imposition of the death penalty for murder is not excessive punishment and thus does not constitute cruel and unusual punishment.

Our Indiana Legislature has defined, in our death penalty statute, circumstances for which society may seek retribution in the form of the death penalty. Ind.Code § 35–50–2–9. Appellant was found beyond a reasonable doubt to have satisfied two of the aggravating factors enumerated by Ind.Code § 35–50–2–9, that of intentionally killing during the perpetration of a rape, and that of intentionally killing during the perpetration of kidnapping. Consequently, our Legislature has deemed imposition of the death penalty a measureable contribution to the acceptable goal of retribution in factual circumstances such as those existing in this case.

Appellant further claims the imposition of the death penalty does not contribute to the acceptable goal of deterrence. He claims those not suffering a mental impairment will not relate to Appellant's case, and those suffering from a mental illness will not be deterred due to their own unique mental circumstances. Appellant again, however, blurs the distinction between insanity and mental illness in our guilty but mentally ill statute. Those who are found guilty but mentally ill are not defendants who, at the time of the crime, fully lacked the capacity to conform their behavior to the law; thus, mentally ill defendants may be deterred by the death penalty. We are not here faced with the question of one who is insane receiving the penalty of death, decided by the United States Supreme Court in *Ford v. Wainwright,* (1986) —— U.S. ——, 106 S.Ct. 2595, 91 L.Ed.2d 335. No reversible error is presented on this issue.

## II

The State sought the death penalty pursuant to Ind.Code § 30–50–2–9(b)(1), which requires the following aggravating circumstance(s) be proven beyond a reasonable doubt: "The defendant committed the murder by intentionally killing the victim while committing or attempting to commit ... kidnapping, rape, or robbery." The State alleged Appellant intentionally killed the victim while committing kidnapping and while committing rape. The trial court found there was evidence establishing beyond a reasonable doubt that both these aggravating circumstances existed. Appellant claims there was insufficient evidence for the trial court to find beyond a reasonable doubt that these aggravating circumstances existed. More specifically, Appellant argues there was insufficient evidence to demonstrate he intentionally killed Jane Brumblay.

When an issue of sufficiency of the evidence is raised on appeal, this Court looks only to the evidence most favorable to the State and all reasonable inferences to be drawn therefrom. We neither reweigh the evidence nor judge the credibility of witnesses. If there is substantial evidence of probative value to support the trial court, the conviction will not be overturned. *Correll v. State* (1985), Ind., 486 N.E.2d 497, 500.

Appellant claims he strangled the victim until she had difficulty breathing and was semi-conscious. However, the evidence most favorable to the State came via testimony of pathologist Edward Wills. Wills testified the victim died as a result of the strangulation, which directly conflicted with Appellant's claim that the victim must have died from swallowing her scarf. Appellant further claims that the fact he released his hold when he saw the victim could not catch her breath and was not fully conscious demonstrates he did not

intend to kill her. This presupposes his knowledge of that degree of strangulation which would not result in permanent injury or death. The duration, brutality, and the relative strengths of the defendant and victim are factors to be considered as indications of Appellant's true intention, and may be used to infer the defendant intended to kill. *Peters v. State* (1984), Ind., 470 N.E.2d 708, 712, *reh. denied* (1985).

■ Appellant further argues the "karmic controllers" in commanding him to rape Jane Brumblay had not ordered him to kill her, so he did not intend to do so. However, Appellant later testified he had exceeded those commands when, in reaction to a violent blow from the victim, he angrily strangled her until she could not breathe and was not fully conscious.

Pathologist Wills testified that the autopsy indicated Appellant must have gripped the victim by the neck in a forceful manner for some length of time. Dr. Wills stated Appellant's hold broke the victim's neck bone, tore tissue, and caused facial hemorrhaging and the bursting of capillaries in the victim's eyes. He further testified that he had never observed hemorrhages such as those found on the victim's body, that were caused by less than five minutes of strangulation. This evidence, indicating Appellant brutally overpowered the victim and strangled her long enough to cause her death, clearly supports the trial court's finding that Appellant intentionally killed the victim. *Id.*

### III

■ Appellant next contends that his death sentence is invalid because our death penalty statute, Ind.Code § 35–50–2–9(g), does not require the trial court to find, nor did the court find, that the mitigating circumstances were outweighed by any aggravating circumstances *beyond a reasonable doubt.* Appellant, recognizing this issue has been resolved adversely to his argument in *Moore v. State* (1985), Ind., 479 N.E.2d 1264, 1281, *cert. denied,* — U.S. ——, 106 S.Ct. 583, 88 L.Ed.2d 565, now urges this Court to reconsider its position.

The reasons he gives are threefold: the vital need to insure the maximum reliability in the determination made by the sentencer; the beyond reasonable doubt standard reflects the value society places on the individual life; and this standard is indispensable in insuring the respect and confidence of the community in application of the criminal law.

Ind.Code § 35–50–2–9(g) reads in part as follows:

"If the hearing is to the court alone, the court shall sentence the defendant to death only if it finds:

(1) That the State has proved beyond a reasonable doubt that at least one of the aggravating circumstances exists; and

(2) That any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances."

In *Moore,* Ind., 479 N.E.2d at 1281, we rejected Moore's argument claiming the death penalty statute unconstitutional for this very reason, citing the following language from *Daniels v. State* (1983), Ind., 453 N.E.2d 160, 171, *reh. denied* (1983):

"However, the determination of the weight to be accorded the aggravating and mitigating circumstances is not a 'fact' which must be proved beyond a reasonable doubt, but is a balancing process."

We now reaffirm this rationale used to dispose of this issue in *Moore,* and reject Appellant's reasons for reassessing our decision therein.

Death penalty statutes similar to ours, in that they require the aggravating circumstances outweigh the mitigating circumstances without a standard of beyond a reasonable doubt, have been recognized as constitutionally valid statutes by the United States Supreme Court. *Gregg v. Georgia,* 428 U.S. at 197, 96 S.Ct. at 2936, 49 L.Ed.2d at 888 (statute held constitutional which did not even require a weighing of circumstances, but merely required one aggravating circumstance be proven beyond a reasonable doubt); *see also Proffitt v. Florida,* (1976) 428 U.S. 242, 251–252, 96

S.Ct. 2960, 2966, 49 L.Ed.2d 913, 922, U.S. *reh. denied* (1976) 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (statute held constitutional which merely required aggravating circumstances outweigh mitigating ones). Appellant claims these cases did not deal directly with the issue involved here, and therefore do not support the conclusion that our statute is constitutional. We disagree. In *Pulley v. Harris* (1984), 465 U.S. 37, 53, 104 S.Ct. 871, 881, 79 L.Ed.2d 29, 42, the United States Supreme Court, in reviewing a California death penalty statute, stated, "By requiring the jury to find at least one special [aggravating] circumstance beyond a reasonable doubt, the statute limits the death sentence to a small sub-class of capital-eligible cases."

Our death penalty statute comports with those recognized as constitutionally valid by the United States Supreme Court.

## IV

■ Appellant's final claim is that there was insufficient evidence to support the trial court's finding that the aggravating circumstances outweighed the mitigating circumstances. He supports this contention by first arguing that the trial court made an improper assessment of the evidence in determining the mitigating factors. He then argues that a review of the mitigating and aggravating circumstances indicates the aggravating circumstances did not outweigh the mitigating circumstances.

Appellant first argues the trial court failed to adequately consider and find certain mitigating circumstances to exist. Ind.Code § 35–50–2–9 provides:

"(c) The mitigating circumstances that may be considered under this section are as follows:

... (2) The defendant was under the influence of extreme mental or emotional disturbance when he committed the murder ... [and,]

... (6) The defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired

as a result of mental disease or defect...."

The trial court, in its written Judgment of Court, found:

"6. That as a mitigating factor the defendant, James Harris, at the time of the commission of said killing was suffering from a psychiatric disorder which was a character disorder and impaired his ability to function.

7. That the psychiatric disorder does not rise to the level where it substantially impaired his ability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

8. Such psychiatric disorder did not place him under the influence of extreme mental or emotional disturbance."

Appellant asserts there was more than sufficient evidence showing his psychiatric disorder rose to a level substantially impairing his ability to appreciate the wrongfulness of his acts and to conform them to the law, and that he was under extreme mental or emotional disturbance when he committed the murder. Thus, Appellant argues the trial court erred in making his findings.

Appellant relies primarily upon the testimony of Dr. Grosz, a physician specializing in neurology and psychiatry. Dr. Grosz testified Appellant suffered from paranoid psychosis. He further formulated and testified as to the following opinions. At the time of the murder, Appellant was operating under the influence of an extreme mental and emotional disturbance. This opinion was based upon his diagnosis that Appellant operated in a fixed delusional system, on a mission to humiliate white women. This delusion was that higher powers, "karmic powers", required Appellant to fulfill certain missions. The doctor further opined that Appellant's capacity to conform his conduct to the requirements of the law was substantially impaired as a result of his delusional state, and that Appellant was operating under a paranoid psychosis at the time of the crime. Dr. Grosz had also examined and testified, without this diagno-

sis, in Appellant's behalf at his trial for rape in 1976.

Contrary opinions were offered by Dr. Dwight Schuster, a physician specializing in psychiatry, and Paul Fredrickson, a psychologist. Dr. Schuster examined Appellant on August 7, 1983, and on November 28, 1983. Dr. Schuster testified that prior to the November 28, 1983 examination, Appellant had not made any statements regarding the delusional "karmic controllers," and that mention was not made of the karmic scheme until the November 28, 1983 examination. This led Dr. Schuster to suspect that the paranoid delusion profile conveyed November 28, 1983 was concocted. He confirmed his suspicion after having a battery of psychological tests run on Appellant. Dr. Schuster did testify that Appellant was suffering from a personality disorder of the antisocial type, that having been his original diagnosis.

Paul Fredrickson, a clinical psychologist, testified that after administering several well-recognized psychological tests, he concluded that Appellant's information concerning karmic controllers was not the product of any mental illness. Fredrickson could not render a competent opinion about Appellant at the time of the crime, although he concluded that Appellant was not mentally ill at the time Fredrickson examined him.

Rita Atkins, Probation Officer for the criminal courts in Marion County, interviewed Appellant on October 13, 1983. Appellant told her at that time that he committed rapes on impulse and that he was usually in a parking garage to burglarize cars. She testified Appellant was very cooperative and responsive, but never made any mention as to "karmic controllers" or to a higher power.

Clearly, there was a conflict in testimony regarding the mental state of Appellant at the time of the crime. We find that the trial court sufficiently considered all the evidence and properly resolved the conflicting evidence by finding Appellant suffered a psychiatric and character disorder at the time of the crime, but that this did not

impair his ability to conform his conduct to the requirements of the law, nor did it place him under the influence of extreme mental or emotional disturbance. There is sufficient evidence of probative value to support the trial court in these findings. *Correll*, Ind., 486 N.E.2d at 500.

■ Finding no error in Appellant's conviction, we are obliged, by statute, to determine whether the death penalty is appropriate considering the nature of this offense and the character of the offender.

After the hearing on the death sentence, the trial court issued the following order:

"The Pre Sentence report having heretofore been ordered and the sentencing hearing conducted on the 18th day of January, 1984. Court then having had this matter under advisement since that date. Court now enters findings as follows:

1. That the Defendant, James Harris did commit the crime of Rape upon the Person of Jane Brumley (sic) on the 28th day of March 28th, (sic) 1983.

2. That the Defendant, James Harris did commit the offense of Kidnapping against the person of Jane Brumley (sic) on the 28th day of March, 1983.

3. That during the course of said rape, the defendant James Harris, did intentionally kill the victim, Jane Brumley, (sic) by strangulation during the course of the rape of Jane Brumley (sic) on said date."

The trial court also found on Friday, February 10th, 1984:

"4. That the Defendant, James Harris did intentionally kill Jane Brumley (sic) during the course of the kidnapping of Jane Brumley (sic).

5. That such aggravating circumstances and intentional killing have been proven by the State beyond a reasonable doubt.

6. That as a mitigating factor the defendant, James Harris, at the time of the commission of said killing, was suffering from a psychiatric disorder was a character disorder and impaired his ability to function.

7. That the psychiatric disorder does not rise to the level where it substantially impaired his ability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

8. Such psychiatric disorder did not place him under the influence of extreme mental or emotional disturbance.

9. Court having examined the pre sentence report and hearing other evidence, does not find any other mitigating factors.

10. The Court now finds that the aggravating factors outweigh the mitigating factors and it is the judgment of this court that the Defendant, James Harris, shall suffer the penalty of death for the offense committed.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the defendant, James Harris, be and he hereby is ordered sent. to the Indiana State Prison where he shall suffer the penalty of death by electrocution before sunrise on the 8th day of June, 1984."

The trial court's findings are amply supported by the record. There was evidence proving beyond a reasonable doubt that Appellant was guilty of the crimes of murder, kidnapping, and rape. Further, the aggravating circumstances were proven beyond a reasonable doubt and outweighed the mitigating circumstances as discussed in Issue IV, *supra*. No reasonable person could find that the death penalty in this case was arbitrarily or capriciously applied, or that it is unreasonable or inappropriate. We therefore affirm the trial court in all things, including the imposition of the death penalty.

This cause is remanded to the trial court for the purpose of setting a date for the death penalty to be carried out.

GIVAN, C.J., and SHEPARD and DICKSON, JJ., concur.

DeBRULER, J., dissents with separate opinion.

DeBRULER, Justice, concurring and dissenting.

At the time of the initial establishment of the plea of guilty but mentally ill at the time of the crime, the legislature also enacted the statute, I.C. 35–36–2–5, to govern the sentencing and treatment of those persons found guilty but mentally ill. That statute provides in full as follows:

35–36–2–5. Sentencing of defendant found guilty but mentally ill

(a) Whenever a defendant is found guilty but mentally ill at the time of the crime, or enters a plea to that effect that is accepted by the court, the court shall sentence him in the same manner as a defendant found guilty of the offense.

(b) If a defendant who is found guilty but mentally ill at the time of the crime is committed to the department of correction, he shall be further evaluated and then treated in such a manner as is psychiatrically indicated for his mental illness. Treatment may be provided by:

(1) The department of correction; or.

(2) The department of mental health after transfer under IC 11–10–4.

(c) If a defendant who is found guilty but mentally ill at the time of the crime is placed on probation, the court may, in accordance with IC 35–38–2–2, require that he undergo treatment. [IC 35–36–2–5, as added by Acts 1981, P.L. 298, § 5; P.L. 320–1983, § 21].

The above quoted statute contains several important and related legislative decisions and judgments among which are the following:

1. Judges and juries of the state are selected to make the determination of mentally ill, rather than psychiatrists, psychologists, or corrections officials.

2. The solemn occasion of the determination of guilt or innocence is selected as the time for the determination of mental illness to be made rather than at the time of sentencing or commitment.

3. The time of the crime is selected as the point at which mental illness to to be determined to have existed or not, and

not the time of sentencing or commitment.

4. The legislature selected itself as the determiner of the class of individual offenders who should be placed on the psychiatric evaluation and treatment track.

The statute as a whole makes a very basic assessment of human nature. It is that when the process of determining mental illness is made by reliable decision makers like judges and juries, at the time of the solemn act of determining guilt or innocence, based upon the most trustworthy evidence available of criminal conduct and its accompanying state of mind, and such process results in the finding of guilty but mentally ill, the individual offender so identified is rehabilitatable and reformable within a prison system which is under a legislative mandate to evaluate and treat.

In the first paragraph, the court is required to sentence all persons falling in the mentally ill class "in the same manner as a defendant found guilty of the offense." Standing alone, this command would appear to answer the question of whether persons found guilty but mentally ill remain subject to the penalty of death clearly in the affirmative as the majority opinion concludes. It does not stand alone however, but is followed by the further command that persons found guilty but mentally ill at the time of the crime be ".. further evaluated and then treated in such a manner as is psychiatrically indicated for his mental illness." Thus, this statute as an answer to the death possibility question, loses it clarity of direction. When considered as a whole, it represents a legislative vision that all persons found guilty but mentally ill at the time of the offense have an illness of the mind which has a nexus with criminal behavior which when properly diagnosed and treated will lead to better conduct. This view is at odds with the vision of human worthlessness which is basic in the death sentence statute. Given the conflict within I.C. 35–36–2–5, and the manner in which its vision differs from the death statute, leads to the conclusion that the statute governing the sentencing which

follows a finding of guilty but mentally ill at the time of the offense is ambiguous with regard to whether it represents a legislative decision that those persons convicted of murder upon a finding or verdict of guilty but mentally ill at the time of the crime shall remain subject to the death penalty.

Due process and due course of law, in this area of absolutes, cannot be satisfied by ambiguities of this sort. If the legislature is persuaded that persons guilty but mentally ill at the time of their crimes fall within that class subject to the death penalty, it should clearly express that decision. Since it has not done so, I would remand this case to the trial court to resentence appellant to a term of years appropriate for his crimes, thus facilitating and placing the burden upon the department of corrections to further evaluate him and then treat him in such a manner as is psychiatrically indicated for his mental illness.