**Robert P. McINTYRE, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 46S00–9606–CR–408.

Supreme Court of Indiana.

Oct. 1, 1999.

Donald W. Pagos, William Janes, Michigan City, Indiana, Attorneys for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

SHEPARD, Chief Justice.

A jury found Robert McIntyre guilty but mentally ill of two counts of murder.[1] The trial court accepted the jury's recommendation against death and sentenced McIntyre to life in prison without parole. In this direct appeal, McIntyre raises ten issues. We affirm.

## Facts

Marcos Ruiz and Rhonda Calvert were murdered in the home of Leo Ruiz during the early morning hours of April 14, 1994. Leo Ruiz, Marcos' father, had been working that night and had called his home at 1:15 a.m. Marcos answered and, in the course of the conversation, told Leo he was alone. When Leo returned home from work around 4:30 a.m., he found the dead body of Marcos on the living room floor and the body of Rhonda in the bathroom. Duct tape had been used to bind Marcos' hands and to cover Rhonda's mouth. An autopsy revealed that Marcos died from a decapitating incision to the neck while Rhonda died from multiple stab wounds and a partial incision to her neck.

Police first contacted Robert McIntyre around 2:30 p.m. on the day of the murders. A local coffeehouse owner, Jim Santolino, called police and told them a man named Robert had been with Rhonda Calvert the evening before. When police interviewed McIntyre, he acknowledged playing pool with Rhonda at the coffeehouse. He said they had later gone to his apartment to drink a few beers and he claimed he walked Rhonda halfway home shortly after 12:30 a.m.

About 8:30 p.m. the same day, McIntyre called the police department and said he had more information. The police picked up McIntyre at his request and brought him to the station, where McIntyre added that he had had sex with Rhonda the previous night. The police then drove McIntyre home.

On April 18th, a person claiming to be McIntyre's mother, Diane McIntyre, called the LaPorte City Police Department to express concern about McIntyre's possible involvement in the crimes. She said McIntyre had gone to Valparaiso, and she provided a phone number where he could be reached. Detective Lynn Cains called the number and spoke with McIntyre. Detective John Kintzele then met McIntyre in Valparaiso and asked him to come to the Porter County Sheriff's Department. McIntyre signed a waiver of rights form around 7:45 p.m. He continued to assert he had walked Rhonda halfway to her home and then returned to his apartment. He said he had returned home by running through yards and going over fences rather than via the sidewalk. Asked whether it was possible that his fingerprints would be discovered at the Ruiz home, McIntyre responded that he had never been in the house and the police would not find his fingerprints anywhere.

An hour after this interview, Detective Kintzele received a phone call at the crime scene from Detective Clyde Crass informing him that McIntyre wished to talk to Kintzele about blackouts he sometimes experienced. Kintzele returned to listen. McIntyre said that he was uncertain whether he had walked Rhonda all the way home. When Kintzele asked McIntyre if he killed Rhonda and Marcos, McIntyre responded that the killer must have gotten a lot of blood on himself, and since he had found no blood on himself, he felt that he

---

1. Ind.Code Ann. § 35–42–1–1 (West Supp. 1993).

had not committed the crime. He also said his fingerprints might have been on the porch. At that point, Detective Kintzele arrested McIntyre and informed him he was charged with two counts of murder. After transporting McIntyre to the La-Porte City Police Department, they placed him in an office, where he executed another waiver of rights form.

In a taped statement given around midnight, McIntyre told police that, though he only partially recalled the events of the evening of the murder, he remembered running home to his apartment with blood on his hands. He also stated, "When I found out that it was a young girl named Rhonda that's been murdered I pretty much knew that it was me who did it." (R. at 1466.) He continued to equivocate regarding whether he had killed Marcos. Around 3 a.m. McIntyre admitted to killing both Rhonda and Marcos and described the details of the acts.

In a final statement, taken at 9:25 a.m., April 21, 1994, McIntyre again admitted the crimes and described the events in detail. On April 21, 1994, McIntyre also correctly described the general design of the Ruiz home to police though he claimed he did not know Marcos Ruiz.

Police investigators found McIntyre's thumbprint on the duct tape which was covering Rhonda's mouth.

## I. McIntyre's Past Acts

The State called Detective Kintzele as a witness in its case-in-chief. He recounted statements McIntyre volunteered before being arrested. Over McIntyre's objection, Kintzele stated:

> He told me that he had had very many encounters with law enforcement before. He stated that there were offenses where he had committed battery against woman [sic], he had hit woman [sic] ... a burglary, there was an offense called car prowling....
>
> I asked him what the longest period he had ever spent in jail was, and he stated when he was around 13 years old

he was convicted of felony rape, that he had used a screwdriver, he indicated about that big (indicating), approximately three inches, as a weapon to rape a 12 year old boy.

(R. at 1342.) The State's theory of admissibility was that McIntyre had volunteered the information. The prosecutor argued, "if a defendant can volunteer that he murdered somebody and we can get that admitted, why can't we get what information the Defendant indicated about himself that he volunteered?" (R. at 1339.) More or less agreeing, the judge admitted the statement.

McIntyre claims the evidence was submitted to show his propensity to act in a criminal manner. The State counters by arguing McIntyre's insanity defense opened the door to all evidence relevant to his sanity, including criminal acts.

■ Whenever the State attempts to introduce evidence of a defendant's prior misconduct, the trial court must consider whether that evidence is offered to prove something other than the defendant's bad character or propensity to commit the charged crime. Ind.Evidence Rule 404(b); *Ross v. State*, 676 N.E.2d 339 (Ind.1996). If it is, the judge must decide whether its probative value outweighs its prejudicial effect. Evid.R. 403; *Ross*, 676 N.E.2d at 346. We review trial court evidentiary rulings for abuse of discretion. *Id.*

Here, our review is complicated slightly by the fact that the trial judge apparently admitted the statements regarding McIntyre's prior bad acts on the theory urged by the prosecutor, that McIntyre had volunteered the information to Detective Kintzele, while the State urges on appeal the testimony was properly admitted as relevant to McIntyre's sanity. (Appellee's Br. at 4–6.) Under either theory, the trial court erred.

■ The trial judge's apparent belief that evidence of McIntyre's past acts was admissible because, "[i]t's all a part of the statement that he gave to the police when

he came in," (R. at 1340), was error under Rule 404(b). While a defendant may waive the protections of Rule 404(b) by offering evidence of his own character at trial, Evid.R. 404(a)(1), he does not waive the protections of Rule 404(b) by volunteering his previous bad acts at some point before trial.

The State's attempt to salvage the trial court's ruling by referring us to the common law insanity exception is a stronger rationale for admitting Kintzele's testimony. Under common law, an insanity defense opened a wide door for any evidence that might throw light on the issue of a defendant's sanity, including past criminal behavior. *Anderson v. State,* 615 N.E.2d 91, 92–93 (Ind.1993). The State urges that this rule applies to the present facts.

The extent to which our common law decisions on this point survive the Indiana Rules of Evidence is a nice issue, but one that does not save the ruling at issue here. Kintzele's testimony was inadmissible under Rule 404(b), and it was irrelevant to the issue of McIntyre's sanity at the time it was offered.[2]

Several aspects of the trial record lead us to this conclusion. First, at the moment the statement was admitted, the focus of the trial was on proving McIntyre actually committed the killings, not on his sanity. The State did not call Kintzele on the issue of sanity. Instead, Kintzele's testimony generally described McIntyre's pre-arrest interview on April 18, 1994, at which McIntyre volunteered his reasons for being in LaPorte and the facts of his relationship with Rhonda Calvert. At most, this evidence provided jurors with a chronology of the events that eventually lead to McIntyre's arrest and confession.

Second, Kintzele's testimony was not admitted to rebut McIntyre's insanity defense inasmuch as McIntyre had not yet provided any evidence about his sanity when the statement was admitted. Third, it appears that nobody present at the trial thought the testimony was being offered on the sanity issue. The prosecutor argued the statement was admissible because it was volunteered by McIntyre, and the judge apparently agreed. (*See* R. at 1339–41.) It is difficult to see how the jury could have been expected to apply such facts to the issue of sanity when even the lawyers present seemed unaware of any such evidentiary nexus at the time the statement was offered.

Accordingly, Kintzele's testimony regarding the defendant's past acts did not conform with the requirements of Rule 404(b) nor did it shed light on the sanity issue at the time it was offered. This conclusion does not necessarily help McIntyre.

When a trial court erroneously admits evidence, we apply the harmless error analysis of Indiana Trial Rule 61, examining whether the error affected the substantial rights of the parties.

Here, there was insufficient impact on McIntyre's substantial rights to warrant reversal. The evidence wrongly admitted against McIntyre was hardly insignificant. On the other hand, properly admitted evidence so solidly implicates McIntyre in the murders that we are satisfied the illicit testimony could not have substantially swayed the jury's verdict. McIntyre confessed, (R. at 1466, 1376, 1516), and described the acts in chilling detail:

**2.** It is the point during trial at which the evidence was admitted coupled with the substance of the comment, not the substantive content of the statement alone, which causes us to find it irrelevant to the issue of sanity. In fact, evidence more explicitly and authoritatively describing McIntyre's past criminal acts was offered by both parties' expert witnesses testifying on McIntyre's sanity. (*See, e.g.,* R. at 2010–11, 2015–16, 2027 (testimony of defense witness, Dr. William Yee, that McIntyre told him that had been arrested for the rape of a young boy and that he had physically assaulted a girlfriend in Washington).)

I was just gonna come in for a second, and uh me and Rhonda were in the bedroom, we went in the back door and uh I put tape over her mouth and . . . the other guy was on the couch sleeping. . . . I woke him up. . . . I put him on the floor and I tied his hands behind his back, and I just reached up and cut his throat. . . . I got up, it was like I was on a mission, . . . [I went] in the bathroom and took—and I tried—cutting her throat, and I ended up stabbing her. . . . I ran out the front door. . . . I was on my way up to Virginia Street to go home. . . . I went in the kitchen and I saw blood all over my hands and I just started washing it off.

(R. at 1376.)

I pulled out some duct tape and I put it around Rhonda's mouth and I escorted her into the bathroom . . . . [s]he got down on her knees and facing the tub. . . . I grabbed Marcos and I kinda drug him onto the floor. . . . Towards the bathroom. . . . [Marcos' head was f]acing the back sliding glass door . . . and his feet were facing the front of the house. . . . I sat on his back and . . . I put his hands behind his back and I tape [sic] em together. . . . And uh he's not saying anything. He's probably not even awake yet. And I, I reached up and I put my hand over his mouth. . . . My left hand. . . . I took a knife out of my pocket and I reached up and I cut his throat. . . . I got up and I went into the bathroom. . . . I went in there and I took my sweater off of Rhonda. . . . [S]he was still knelt down by the tub. . . . Facing away from me. . . . I reached up to cut her throat and I ended up stabbing her. . . . I was behind her. . . . [The knife was in] my right hand.

(R. at 1516.)

Moreover, McIntyre's confessions include statements that indicate he knew facts only the murderer or the police investigators could have known. For example, McIntyre's statements about where he

killed each victim and the position of their bodies coincided with the actual locations and positions in which the bodies were found. (*Compare* McIntyre's description, R. at 1516, *with* testimony and photographic evidence describing the scene, R. at 942–944, 990–91, 1031, 1033–35, 1039–43.)

Moreover, McIntyre's thumbprint found on the duct tape over Rhonda's mouth corroborates the previously noted confessional evidence and independently links him to the murders. Accordingly, we think it unlikely the evidence of McIntyre's past acts substantially swayed the jury.

## II. The Telephone Call by McIntyre's Mother

Detective David Gariepy testified that a woman identifying herself as McIntyre's mother, Diane McIntyre, had called him and

asked if Robert was considered a suspect in our homicide investigation as Robert had indicated to her that he wanted to come home and she didn't want him returning home if this was ongoing. . . . She continued to tell me that Robert couldn't be trusted to tell the truth and she further indicated that he was currently staying with a girl by the name of Danielle in Valparaiso, Indiana and she provided us with the phone number of Danielle.

(R. at 1266.) Over a defense hearsay objection, the trial court admitted the testimony, but admonished the jury that the "statements of the female caller are not submitted to prove the truth of what she said, but only to explain Sergeant Gariepy's actions after the telephone call and must be disregarded for any other purpose." (R. at 1265.) McIntyre contends that admitting this statement was error.

■ When the admissibility of out-of-court statements received by police officers engaged in investigative work is challenged as hearsay and the State urges a purpose other than to prove a fact therein asserted, we apply the analysis set forth in

*Craig v. State*, 630 N.E.2d 207 (Ind.1994). We consider whether the fact to be proven under the State's suggested purpose is relevant to some issue of consequence, and then consider whether the danger of prejudice outweighs the evidence's probative value. *Id.* at 211.

■■■ The facts leading the police to Valparaiso in search of McIntyre were only marginally relevant. While the alleged Ms. McIntyre's statement did show the police were not acting arbitrarily in their investigation, neither the general reasons they had for going to Valparaiso nor the specific words of the statement were contested.[3] The State argues on appeal that McIntyre raised the issue of the propriety of the police investigation in his opening statement. (Appellee's Br. at 7–8.) Opening statements are not evidence, however, and the propriety of the police investigation was not otherwise questioned by McIntyre.

As for the second part of the *Craig* test, we conclude the probative value of the above testimony (that the jury is able to understand why the police continued to investigate McIntyre) was outweighed by its prejudicial effect (that the jury could easily deduce that McIntyre's own mother believed he was a legitimate suspect in a homicide investigation, that he couldn't be trusted to tell the truth, and that he planned to flee Indiana.)[4]

■■■ Although McIntyre's claim satisfies the *Craig* test, it fails on harmless error. The testimony provided only circumstantial evidence of McIntyre's guilt, was given only once, and the facts revealed by the statement were generally available to the jurors via other valid evidence. Danielle Woday testified that on April 18, 1994, she took McIntyre to a Valparaiso Western Union office to pick up $400 wired to him by his mother. (R. at 2140–41.) Further, considerable evidence supports McIntyre's conviction, such as his confession and his thumbprint on the duct tape. Finally, the judge gave an appropriate admonition. This error was harmless.

## III. Evidence of Other Possible Suspects

McIntyre claims the trial court erred in not allowing him to submit evidence to show that others may have committed the murders. McIntyre's tendered evidence consisted of multiple witnesses' statements about suspicious cars in the neighborhood and overheard threats to kill Rhonda and Marcos.

The State urges us to apply the standard set out in *Burdine v. State*, 515 N.E.2d 1085, 1094 (Ind.1987). The *Burdine* test, however, has been superceded by the Indiana Rules of Evidence, effective January 1, 1994. *See Joyner v. State*, 678 N.E.2d 386, 389 (Ind.1997), *reh'g denied*. Evidence, including evidence that another person may have committed the crime at issue, is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.;* Evid.R. 401.

■■■ We review admissibility determinations for abuse of discretion, and reversal is appropriate only where the decision is clearly against the logic and effect

3. Indeed, McIntyre specifically offered to stipulate the investigative link between the telephone call and the later police contact with him in Valparaiso. (R. at 1259.)

4. The trial judge questioned the effect the above testimony would have on the jury, stating to the prosecutor at a side-bar conference:
 It seems to me that we're, we're talking about 10 minutes of testimony when in essence with—what you're trying to do is show why did he call this number to contact the Defendant. And I don't have an issue with allowing that to get in. Where I've got the issue is all of the other stuff that comes in along with it that frankly the jury can, can make assumptions or inferences from it that I don't think are fair.
 (R. at 1258.) The judge was correct in this analysis.

of the facts and circumstances. *Joyner*, 678 N.E.2d at 390. Here, much of the evidence offered by McIntyre would have been inadmissible as hearsay and all of it was speculative.[5] Considering the negligible value of the offered testimony, we conclude the trial judge acted within the range of his discretion when he excluded it.

## IV. Intoxication Instructions

McIntyre tendered an instruction on the intoxication defense, which the court refused for lack of evidence. McIntyre claims there was sufficient evidence regarding intoxication to oblige the court to give his instruction.

■■■■ A court must give a properly tendered instruction on intoxication when the "evidence of intoxication, if believed, is such that it could create a reasonable doubt in the mind of a rational trier of fact that the accused entertained the requisite specific intent." *Williams v. State*, 273 Ind. 105, 402 N.E.2d 954, 956 (1980). Evidence that the defendant had merely been drinking is insufficient to raise the defense of intoxication, *Hubbard v. State*, 469 N.E.2d 740 (Ind.1984), and where the record contains no evidence that the defendant claimed an inability to form the requisite mens rea because of intoxication, the court may properly refuse to instruct on the issue.

■■■ While testimony at trial posited that McIntyre consumed alcohol on the evening of the crimes, the intoxication defense was not mentioned in either opening or closing argument, nor did McIntyre offer any evidence for the apparent purpose of showing he was intoxicated. Several of the State's witnesses testified McIntyre

did not appear intoxicated. The defense did not challenge this testimony on cross-examination. McIntyre asserts on appeal that the testimony of Dr. Berkson, stating McIntyre suffered from an alcoholic blackout at the time of the offense, was sufficient to require an instruction on intoxication. The testimony from which this observation is taken, however, is generally oriented toward the issue of McIntyre's sanity. Given the paucity of evidence or argument asserting McIntyre was intoxicated, the jury could not reasonably have plucked this evidentiary needle showing intoxication from the haystack of evidence on insanity without guidance from defense counsel. We conclude the court appropriately refused the instruction.

## V. State's Amendment to Its Death Penalty Request

On April 29, 1994, the State filed its death penalty request: "Robert P. McIntyre did then and there unlawfully, knowingly or intentionally murder a human being, Rhonda Calvert, *after* said defendant, Robert P. McIntyre, had murdered another human being, Marcos Ruiz. . . ." (R. at 52.) The statutory aggravating factor alleged was thus: "The defendant has committed another murder, at any time, regardless of whether the defendant has been convicted of that other murder." Ind.Code Ann. § 35–50–2–9(b)(8) (West Supp.1993). The original prosecutor thought that proving the order of the killings was required. (R. at 406–07.) On May 16, 1995, after learning that McIntyre intended to assert that the State could not prove the specific order of the deaths it had alleged, the new prosecutor, Scott Duerring, moved to amend the informa-

---

**5.** An example of the type of evidence McIntyre presented to the trial judge follows. McIntyre claimed the witness "will testify that Jason Foster wished someone would kill Marcos. Carl also heard the Latin Kings were after Marcos and he observed some of them, the Latin Kings, in a black pick-up truck about three weeks ago asking where Marcos lived." (R. at 2181–82); *cf. Joyner*, 678

N.E.2d at 390 (trial court abused its discretion when it excluded defendant's physical evidence, including a hair sample retrieved from a garbage bag found over the victim's head which excluded defendant and implicated another suspect, and testimonial evidence that showed this alternative suspect had motive and opportunity to commit the crime in question).

tion, arguing the proposed change was proper under the statute authorizing amendments, Ind.Code § 35–34–1–5. The court permitted the amendment, granted McIntyre's motion for continuance, and re-set the trial for September 26, 1995.

McIntyre asserts error on two grounds. First, he argues the court relied on the wrong statute. He claims that Ind.Code § 35–34–1–5 is not applicable to death pen-alty requests, citing *Games v. State*, 535 N.E.2d 530 (Ind.1989), *cert. denied*, 493 U.S. 874, 110 S.Ct. 205, 107 L.Ed.2d 158. Second, he argues the sequence of the murders was part of the State's prosecuto-rial theory and the amendment took away a defense available to him under the origi-nal information, prejudicing his substantial rights.

We first consider which statute applies. In *Games,* we held that Ind.Code § 35–34–1–5 does not apply to preclude informa-tions requesting the death penalty filed subsequent to the initial charging informa-tion. *Games,* 535 N.E.2d at 535. We reasoned that because Ind.Code § 35–50–2–9 requires death penalty requests to be filed separately, such a request is not an "amendment" of the original charging in-strument itself. *Id.*[6]

In *Thacker v. State,* 556 N.E.2d 1315 (Ind.1990), we considered whether Ind. Code § 35–34–1–5(c) governs an amend-ment to an already existing death penalty request. We concluded it did, observing that this section protects a defendant's right to reasonable notice and a fair oppor-tunity to be heard concerning amendments by the State. *Id.* We also acknowledged that those rights exist whether the instru-ment alleges that the defendant committed a crime, that he is a habitual offender, or that the death penalty is applicable. *Id.* (citing *Oyler v. Boles,* 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); *Daniels v. State,* 453 N.E.2d 160 (Ind.1983); *Barnett v. State,* 429 N.E.2d 625 (Ind.1981)).

 Thus, *Games* stands in part for the proposition that a charging informa-tion, a request for habitual offender sen-tencing, and a death penalty request are separate legal instruments and the latter two are not mere amendments to the first when submitted after the first. *Thacker* stands for the proposition that section 35–34–1–5 governs subsequent attempts to change any of these instruments after they are initially filed. Since the prosecutor here amended a previously filed death pen-alty request, *Thacker* applies and the trial court's reliance on Ind.Code § 35–34–1–5 was correct.[7]

McIntyre next argues the State's amendment to its death penalty request, i.e., removing the contention that he killed Calvert *after* he killed Ruiz, changed the prosecutor's theory of the crime and elimi-nated a defense available to McIntyre, thereby prejudicing his substantive rights.

 An amendment is one of form and not substance if a defense under the original information would be equally available after the amendment and the ac-cused's evidence would apply equally to the information in either form. *Sharp v. State,* 534 N.E.2d 708 (Ind.1989). Fur-ther, an amendment is of substance only if

6. Specifically, the Court held that filing a death penalty request after filing a charging information was analogous to filing a subse-quent request that a defendant be charged as a habitual offender. Our cases have held such an addition is not an "amendment" to the charging information and, also, that such an addition does not in itself prejudice the substantial rights of the appellant. *See Games,* 535 N.E.2d at 535 (citing *Howard v. State,* 268 Ind. 589, 377 N.E.2d 628 (1978), *cert. denied,* 439 U.S. 1049, 99 S.Ct. 727, 58 L.Ed.2d 708; *Gilmore v. State,* 275 Ind. 134, 415 N.E.2d 70 (1981)).

7. Whether *Games* or *Thacker* applies is only modestly important since in either case the trial court's approval of an amendment or addition will be deemed proper as long as the change does not prejudice the substantial rights of the defendant. *Compare Games,* 535 N.E.2d at 535, *with Thacker,* 556 N.E.2d at 1318.

it is essential to making a valid charge of the crime. *Id.*

■■■■ Though the first prosecutor predicated his death penalty request on the theory that McIntyre killed one victim before the other, we conclude the second prosecutor's amendment of that theory did not prejudice McIntyre's substantive rights. We reach this conclusion by considering the second part of the test stated in *Sharp:* an amendment is of substance only if it is essential to a valid charge of the crime. *Id.* In determining whether an alleged fact is essential to a valid charge, the law itself, and not a prosecutor's mistaken belief about the law, guides us. Here, the prosecutor did not need to prove the order of killing to request the death penalty; he only needed to allege that the defendant had committed another murder "at any time." Ind.Code Ann. § 35–50–2–9(b)(8) (West Supp.1998). Accordingly, the amendment was one of form and not substance and the trial court's granting of McIntyre's request for a continuance adequately protected his right to notice and his opportunity to be heard.

### VI. McIntyre's Sentence of Life Without Parole

■■■■ McIntyre claims a jury verdict of guilty but mentally ill precludes a sentence of life without parole. Our statute states otherwise: "Whenever a defendant is found guilty but mentally ill ... the court shall sentence the defendant in the same manner as a defendant found guilty of the offense." Ind.Code Ann. § 35–36–2–5(a) (West Supp.1993); *Harris v. State,* 499 N.E.2d 723 (Ind.1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987). A defendant's mental illness certainly weighs in the sentencing decision, but it does not preclude a sentence of life without parole.

### VII. Adequacy of Instructions

McIntyre alleges the court erred in refusing his tendered instructions on mitigating evidence. Instead, the court instructed the jury:

You are also to consider any of the following mitigating circumstances that you may find to exist: The defendant: (1) was under the influence of extreme mental or emotional disturbance when he committed the murder; (2) capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication; [or] (3) any other circumstances appropriate for consideration.

You are to consider both the aggravating circumstance and mitigating circumstances and recommend whether the death penalty, life imprisonment without parole or neither should be imposed. You may consider all the evidence introduced at the trial resulting in the defendant's conviction of murder, together with any new evidence presented at this hearing.

(Supp. R. at 114.) McIntyre claims this instruction is inadequate because the word "appropriate" did not let jurors know what factors were indeed appropriate to consider as mitigating.

■■■■ A trial court's refusal of tendered instructions that ask the jury to consider the mitigating aspects of a defendant's life history and character does not preclude the jury from considering this type of evidence; rather, it declines to invite such consideration. *Bivins v. State,* 642 N.E.2d 928, 950 (Ind.1994). The instruction recited above specifically told the jury it could consider all trial and sentencing hearing evidence. Assessing the evidence admitted at trial and during sentencing, we conclude the jury had an adequate understanding of what facts were appropriate for consideration. Much information about McIntyre's difficult childhood and his character was available via the testimony of psychiatrists, (R. at 1742–1890, 1919–2112, 2146–73), and through McIntyre's own testimony.

When we consider the court's final instruction to the jury:

> Each of you individually may consider as a mitigating factor any other circumstances appropriate for consideration. Any one or more of you may find the existence of a mitigating factor if it is based upon any evidence at either the guilt or the sentencing stage of this trial.... Each of you must give effect to any and all mitigating factors, which you personally find to exist.

(R. at 2723–24.) We conclude the jury was sufficiently notified that it was free to give independent mitigating weight to aspects of the defendant's character and history in its sentencing decision.

## VIII. State's Argument at Sentencing

McIntyre argues the State made an inappropriate victim impact argument at sentencing. Specifically, he urges the trial court erred in allowing the State momentarily to place photos of the deceased on an easel in front of the jury. He also sees error in the prosecutor's later comment, "Murder is the ultimate act of depersonalization. It transforms a living person with hopes, dreams and fears into a corpse." (R. at 2713.)

McIntyre relies on our decision that in capital cases, Article I, Section 16 of the Indiana Constitution requires that victim impact evidence be limited to evidence relevant to those aggravating circumstances specified in our death penalty statute, Ind. Code § 35–50–2–9(b). *Bivins*, 642 N.E.2d at 955. How the rule in *Bivins* applies to sentences of life without parole is a nice question, but one we need not explore at length in this case.[8]

The photographs of the deceased, viewed earlier by the jury, were not victim impact evidence as we have used that term in our cases.[9] We think the prosecutor's later statement about murder was rather obvious—that murder ends a life and all the things that make life meaningful. It is unlikely that jurors were unaware of these grave effects of murder. We see no error.

## IX. Sentencing

The jury recommended McIntyre receive a sentence of life without parole. The judge found the jury's recommendation reasonable and declared that the several mitigating factors were outweighed by the single aggravating circumstance. (R. at 2754.) The statutory aggravating factor, proven beyond a reasonable doubt, was that McIntyre had committed another murder. The mitigating factors considered by the trial court were: the defendant was under the influence of extreme mental or emotional disturbance at the time of the murders, his capacity to appreciate the criminality of his conduct was substantially impaired as a result of mental disease, and he expressed remorse for his actions and the crimes he committed. McIntyre argues that the trial court erred in weighing these factors.

Several mitigating circumstances may be outweighed by one aggravating factor, and the commission of another murder is an aggravating circumstance of the highest order. *Baird v. State*, 604 N.E.2d 1170 (Ind.1992), *cert. denied*, 510 U.S. 893, 114 S.Ct. 255, 126 L.Ed.2d 208 (1993). Here, the trial court meticulously complied with the procedure prescribed by law. Ind.Code Ann. § 35–50–2–9 (West Supp. 1997). The judge duly considered the rec-

8. The trial judge did consider *Bivins* in ruling on defense objections to the photographs, restricting their use to the moment the prosecutor used them for "identification." (R. at 2710–12.)

9. No evidence about how the acts of McIntyre specifically affected the victims and their families, the kind we normally characterize as

"victim impact", was here admitted. *See id.* at 957 (The "victim impact" evidence admitted in *Bivins* was the testimony of the victim's wife, who stated she had lost the companionship, love, protection, care, friendship, and income of her husband because of the defendant's acts).

ommendation of the jury, found the State had proven at least one aggravating factor beyond a reasonable doubt, and weighed the specific, applicable mitigating and aggravating factors. His sentencing decision was based on the reasonable recommendation of the jury and on his own specific and clear findings. The court did not err.

### X. Newly Discovered Evidence

■ McIntyre filed a motion to correct error, alleging two grounds for a new trial. He first claimed newly discovered evidence showed he was in the company of two previously unknown witnesses near the time of the murders whose testimony he claimed would make it highly unlikely that he could have committed the crime. (R. at 4.) McIntyre also alleged the State violated its duty to disclose exculpatory evidence by not informing him that one of the State's witnesses, Robert O. Taylor, had been convicted of operating a vehicle while intoxicated, that a petition for revocation of his suspended sentence was pending against Taylor, and that an arrest warrant was outstanding against Taylor at the time he testified. The court denied McIntyre's motion. Denial of a motion predicated on newly discovered evidence is a discretionary ruling, reviewed deferentially. *Fox v. State*, 568 N.E.2d 1006 (Ind.1991) (citing *Hammers v. State*, 502 N.E.2d 1339 (Ind. 1987)).

In denying McIntyre's motion, the trial judge found:

> [the new evidence] is cumulative and it would not produce a different result. The evidence submitted at the trial of this cause indicates that Marcos Ruiz was alive at 1:30 AM when his father called the home. The evidence also indicates, via a stipulation entered into evidence, that a witness would have testified that the Defendant arrived at the Carriage House apartments between 3:00 to 3:30 AM. The testimony from the two new witnesses only tends to support this time sequence that was presented in evidence to the jury in this cause. As such the newly discovered evidence would not tend to prove or support a different result should this matter be retried.

(R. at 383.) Our review of the evidence causes us to conclude the trial judge was right.

■ The touchstone fact is that Marcos Ruiz's father spoke with Marcos on the phone at 1:15 a.m. the night Marcos was murdered. McIntyre's new evidence was the testimony of Angela Carter and Kelly Kronk. Both women were at Time Out II, a bar in LaPorte, in the early morning hours on the night of the murders. Kronk was working at the bar, while Carter was waiting for Kronk to get off work so she could have a ride home. The two women were leaving the bar after it closed, which is normally around 2:30 to 3 a.m., when McIntyre approached them in the alley behind the bar and asked if they could give him a ride to the Carriage House Apartments. They agreed to help. At the time, neither woman saw blood on McIntyre. Kronk recalls that the clock in her car read 1:48 a.m. as she was driving McIntyre home.

McIntyre asserts this testimony would have shown the jury that it was nearly impossible for him to have committed the murders sometime after 1:15 a.m. On cross-examination, however, Kronk said the ride occurred sometime between 2:30 and 3 a.m. and that her clock might have been wrong due to the winter-spring time change. All other evidence, including McIntyre's own stipulation regarding the time he returned to the Carriage House Apartments, points to the conclusion that McIntyre returned home around 3 a.m. There was no error in denying a new trial based on this evidence.

The judge also denied the motion to correct error on the second ground alleged, finding the State had used reasonable means to determine the criminal background of Robert Taylor and did not violate the court's discovery order inas-

much as the prosecutors did not know about the proceedings to revoke Taylor's probation. The judge found the evidence regarding Taylor's criminal record and the outstanding actions against him to be "not material or relevant in that it is not admissible evidence to impeach the credibility of the witness." (*Id.*)

■ The State is required to disclose material exculpatory evidence, including impeaching evidence. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We do not agree with the trial judge's finding that the evidence of Taylor's legal problems was wholly irrelevant to Taylor's possible bias. Materiality is another matter.

■ The materiality question is whether, based on the totality of the circumstances, there is a reasonable probability that withholding such impeachment evidence resulted in the defendant not receiving a fair trial, thereby undermining confidence in the trial's outcome. *Games*, 684 N.E.2d at 472 (citing *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

■ The State's failure to supply McIntyre with evidence of Taylor's DUI conviction, or to disclose the petition to revoke his probation and his arrest warrant, does not undermine our confidence in the trial's outcome.

First, the facts provided by Taylor's testimony were generally available through other evidence. Taylor's testimony placing McIntyre with one of the victims on the night of the murder was corroborated by the testimony of others, including McIntyre himself. Taylor's most damaging evidence was probably his testimony that he was missing a knife and a roll of duct tape from his home. Since McIntyre was Taylor's roommate and articles of this type were used in the murder, the jury could easily infer that McIntyre took the items and used them on the victims. How-

ever, other evidence linked McIntyre to the instruments used to kill. McIntyre himself stated he took the tape and knife from the apartment he shared with Taylor and used them to bind and stab the two victims, and McIntyre's thumbprint was found on the duct tape on Rhonda Calvert's mouth.

Finally, while evidence of Taylor's legal troubles could have affected the jury's view of his veracity, Taylor's reliability as a witness was otherwise put into question. During cross-examination, Taylor was confronted with several instances in which he either made prior inconsistent statements or failed to remember what he had told police. He also indicated that the knife he claimed was missing had a wooden handle while McIntyre said in his confession that the handle of the knife he used was stone or bone. We conclude there is no reasonable probability that, had the impeachment evidence been available to the defense, the result of the proceedings would have been different, nor is our confidence in the outcome undermined.

### Conclusion

We affirm the judgment of the trial court.

DICKSON, SELBY, and BOEHM, JJ., concur.

SULLIVAN, J., concurring and dissenting with separate opinion.

SULLIVAN, Justice, concurring and dissenting.

I concur in the Court's opinion except Part VI. A sentence of life without parole is proper in this case only if "any mitigating circumstances that exist are outweighed by the aggravating circumstance" the State has proved. Ind.Code § 35–50–2–9(i)(2) (1993). I do not believe that standard has been met here.

The aggravating circumstance proved by the State in this case was the multiple murder aggravator, Ind.Code § 35–50–2–9(b)(8). Without question, this aggravator

should be weighed in the highest range. *Roche v. State*, 596 N.E.2d 896, 902 (Ind. 1992) (DeBruler, J., concurring). But I would assign the mitigating circumstances here—Defendant's long history of severe mental illness and the fact that the jury unanimously found him to be mentally ill—equal if not greater weight.

At trial, defense counsel presented the testimony of Dr. Jeffrey Samelson who earned a doctorate in clinical psychology and who practiced in Michigan City for eighteen years. In Dr. Samelson's opinion, Defendant was insane at the time of the killings.

During the ten sessions in which he examined Defendant, Dr. Samelson performed a clinical evaluation, administered personality tests, and reviewed Defendant's medical and psychological history. According to Dr. Samelson's testimony, Defendant had been: (1) repeatedly raped by his older brother when he was a child; (2) stabbed by another brother;[1] (3) sexually molested by a school tutor; (4) abandoned by his real father; and (5) hospitalized several times for depression and suicide attempts. Dr. Samelson also testified that Defendant had a long history of serious alcohol and drug abuse. With respect to the personality tests, Dr. Samelson found Defendant suffered from confusion, depression, anxiety, emotional instability, low self-esteem, and thoughts of suicide.

Relying upon this information and his evaluation, Dr. Samelson determined that Defendant was suffering from five different mental diseases including: bi-polar disorder, chronic dysthymia, personality disorder with borderline dependant and antisocial features, alcoholism and substance abuse, and post-traumatic stress, most of which are recognized in the Diagnostic and Statistical Manual of Mental Disorders.

Dr. George Batacan, a court-appointed psychiatrist, also diagnosed Defendant with bi-polar disorder and substance abuse. Consistent with Dr. Samelson's opinion, Dr. Batacan's opinion was that Defendant was insane when the killings occurred. Dr. Batacan's psychiatric evaluation and mental status report to the trial court showed that Defendant suffered from a long history of mental illness including bi-polar disorder, manic depression, major depression, and sociopathic personality disorder, and his report summarized Defendant's history of hospitalization for suicide attempts and mental illness.[2]

Two other court-appointed psychiatrists, both with extensive experience, also testified at trial. Their testimony was consistent with that of Dr. Samelson and Dr. Batacan as to Defendant's background and history of mental illness. Dr. William Yee testified that there was "no doubt" in his mind that Defendant suffered from mental illness but that he was "unable to say either way ... whether he was insane or not at the time of the [murders]." Dr. Myron Berkson, as the Court discusses in Part IV of its opinion, reported that Defendant suffered from a mental disorder at the time of the murders. His report also identified additional mental illnesses from which Defendant suffered. However, Dr. Berkson was of the opinion that Defendant was not insane at the time of the killings.

In addition to this extensive record of severe mental illness, the jury unanimously found Defendant to be mentally ill at the time he committed the murders.

Based on the testimony of four experts—Dr. Samelson, Dr. Batacan, Dr.

---

1. Dr. Samelson testified that Defendant's brothers "made him crush an animal to death" and that at twelve years of age, Defendant witnessed a young friend overdose on acid.

2. For treatment of his mental illness and suicide attempts, Defendant had been committed to Good Samaritan Mental Health Center, Harborview Medical Center, Western State Hospital, and Puget Sound Hospital, all of which are located in the state of Washington.

Yee and Dr. Berkson—that Defendant had a long history of severe mental illness and the fact that the jury unanimously found Defendant mentally ill, I would find that the aggravating circumstance does not outweigh the mitigating circumstances in this case. I would vacate Defendant's sentence of life without parole and instead impose a term of years.