## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 25 2018, 10:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael Frischkorn
Fortville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Spencer Michael Spielman,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

May 25, 2018

Court of Appeals Case No.
30A05-1709-CR-2096

Appeal from the Hancock Superior Court

The Honorable Terry Snow, Judge

Trial Court Cause No.
30D01-1610-MR-1819

**Altice, Judge.**

## Case Summary

Spencer Spielman appeals his convictions for murder and Level 5 felony robbery, as well as his aggregate sentence of fifty-five years in prison with five years suspended to probation. On appeal, Spielman raises the following issues for our review:

1. Was his confession improperly admitted into evidence?

2. Did the State present sufficient evidence to support the convictions?

3. Do the convictions for both murder and robbery violate principles of double jeopardy under the Indiana Constitution?

4. Is Spielman's sentence inappropriate in light of the nature of the offense and his character?

We affirm.

## Facts & Procedural History

When Patricia Dresser returned to her Greenfield home after work on October 12, 2016, she discovered that someone had broken into her home, where she lived alone. Beginning around 7:30 p.m. and throughout the evening, Dresser communicated with friends and family regarding the break-in. She indicated

that she believed it was her son Nick's[1] "loser friend" Spencer, who had the code to her garage. *Transcript Vol. V* at 133. Dresser stated that she believed he was trying to find a valuable watch that she had hidden and that he instead took alcohol and left a mess. Around 7:40 p.m., Dresser took several pictures on her iPad to document the break-in. These pictures were of watch boxes, an open cabinet in the kitchen, and a grate knocked off the bottom of the refrigerator. Instead of calling the police, Dresser told her friends that she was just going to change the code to the garage door.

[4] Phone records show that Dresser tried to call Spielman at 9:02 p.m. and then sent him text messages at 9:49 p.m. and 12:33 a.m. In her first text, Dresser wrote: "Don't test me. I know you were at my house today. Don't ever break into my house again. I will have you arrested and thrown into jail. This is a courtesy." *Vol. of Exhibits*, State's Exhibit 101. She wrote in the 12:33 a.m. text to Spielman: "Oh, I have you [on] video. DO NOT TRY IT AGAIN". *Id.*

[5] After midnight, Dresser indicated in messages to others that she was trying to sleep but was having trouble. She sent her last message to someone at 12:43 a.m., stating: "Ok, kinda scared. Can't sleep, worried what crazed, drug addicted, strung out kids might do. I'm all locked down, but apparently worried. I just want a Peaceful Easy Feeling, which I'm not feeling." *Vol. of*

---

[1] Dresser had two adult sons. Nick, her youngest son, had left for the military several months earlier and was good friends with Spielman. Dresser had a history of trying to help Spielman and give him odd jobs around her house to earn money.

*Exhibits*, State's Exhibit 98. At some point after this last message, Dresser was strangled to death and left on the couch. Her television, iPad, wi-fi hotspot, iPhone, wallet, and car were all taken from the home. Dresser's cold, lifeless body was discovered around 10:00 p.m. on October 13, 2016, after she had missed work and dinner with a friend.

[6] Responding officers found Dresser lying supine on a living room couch wearing a red robe. Her left arm was dangling off the couch, with the sash to her robe on the ground below her left hand. One of Dresser's slippers was found on the floor near the couch, while the other one was in the kitchen. There were several pillows on the couch, two of which were oddly "positioned on top of [her] legs…like you would display a pillow on a couch for decorative use." *Transcript Vol. IV* at 27. The officers found no evidence of forced entry into the home but found some signs of a struggle in the kitchen. Additionally, officers discovered Spielman's baseball hat in Dresser's front lawn.

[7] The subsequent autopsy indicated that Dresser had been killed by asphyxiation due to smothering and ligature strangulation. The pathologist observed parallel band marks on Dresser's neck that matched the width of the robe sash and appeared to wrap around her neck multiple times. Dresser also had injuries to her lip and chin and fingerprint-like bruises on her armpit, which occurred near the time of her death.

[8] The investigation quickly focused on twenty-year-old Spielman, who was unemployed and couch surfing around this time. Spielman had a cell phone

but did not have phone service, so he relied on wi-fi, a texting app (through which he could make calls and send text messages), and Facebook Messenger to communicate with others. After several hours of silence, Spielman began sending messages to friends – Brandon Humphries and Brandon Kimberlin – around 2:30 a.m. on October 13, using Dresser's hotspot for a wi-fi connection.

[9] At 2:36 a.m., he sent a message to Humphries offering to sell a "tv a 55 inch flatscreen". *Vol. of Exhibits*, Defendant's Exhibit X. Spielman picked up Kimberlin on the way and arrived at Humphries's residence just after 3:00 a.m. Spielman was driving Dresser's vehicle with her television in the trunk. He told the others that the car was his mom's and that the television came from his room at his mom's house. Humphries purchased the television for twenty dollars and a vape.

[10] Over the next two days, October 13 and 14, Spielman openly drove Dresser's vehicle and took friends to various locations in it. He bragged about how fast the car went and sent a picture of the speedometer to someone on at least one occasion. He also sought the assistance of others in an attempt to unlock Dresser's iPad, which was password protected.

[11] Spielman drove Humphries to several local pawn shops during the late morning on October 13. Humphries eventually pawned the television in Indianapolis for $150. The next morning, Spielman drove Humphries to more pawn shops in an attempt to sell car rims. They then drove in Dresser's vehicle to Kentucky to sell the rims. Spielman used Dresser's gas card along the way. On their return

trip that evening, Spielman learned from others that the police were looking for him. He was pulled over in Greenfield around 9:00 p.m. on October 14. Both he and Humphries were taken into custody.

[12] After speaking with Humphries, detectives began interrogating Spielman just before 11:00 p.m. Spielman was advised of his Miranda rights, and he signed an advisement of rights form. Spielman acknowledged being at Dresser's home during the early evening hours of October 12. In his initial detailed story, Spielman indicated that he was cleaning the home – to which he did not have the garage code – and that Dresser let him borrow her car when he left around 8:30 p.m. on October 12. He indicated that she was drunk and arguing with a man named John when he left. About twenty-five minutes into the interview, the officers confronted Spielman with details in his story that did not match up with the evidence and indicated that they knew he was lying. They noted that they knew about the pawned television and that Spielman had used Dresser's gas card on the way to Kentucky. Forty-five minutes into the interview, Spielman was informed that this was a murder investigation and that he could be facing up to sixty years. Spielman eventually admitted that he had Dresser's garage code and had come into her home in the middle of the night and took the television because he needed money.

[13] An hour and thirty minutes in, Spielman provided a new story after indicating that he had made up the first one about a man named John being there. The details of this account evolved over the next thirty minutes, but Spielman continued to deny killing Dresser. Spielman said that Dresser freaked out on

him and hit him in the back of the head as he walked to the garage. According to Spielman, she was drunk and fell off a chair in the kitchen, injuring her lip. He helped her up by the arm and walked her over to the couch. Spielman stated that he picked up the sash to her robe and put it on the floor next to her on the couch before he left in her car. He also indicated that there was a pillow placed behind her head, one at the side of her head, and one by or on her feet.

[14] Two hours into the interview, the officers indicated that Dresser was found dead on the couch and that there was evidence from the autopsy that the sash had been wrapped around her neck. Spielman denied choking her and reiterated that he had just moved the sash, folded it, and placed it on the floor. Spielman yawned multiple times, and the officers gave him a smoke break.

[15] After the break around the two-hour and twenty-minute mark, Spielman told the officers that he was ready to tell them what happened. Over the next ten to fifteen minutes, Spielman confessed to killing Dresser. He indicated that after Dresser fell in the kitchen and was moved to the couch, she freaked out, began hitting him, and threw a black dress at him. He took the dress[2] and put it over her head and then wrapped the sash around her neck twice and tightened it. When he returned later to remove the dress and sash, Dresser was dead and gray in color. Spielman indicated that he would have confessed quicker but he thought the victim's family was on the other side of the two-way mirror during

---

[2] A black shirt dress was recovered from the scene. From a photograph of the scene, it appears to have been found on a side table next to the couch.

the interrogation. Officers photographed a scratch on Spielman's left arm. Later DNA testing revealed the presence of Spielman's DNA in finger swabs of Dresser's right hand.

[16]     On October 17, 2016, the State charged Spielman with murder, Level 5 felony robbery, and Class A misdemeanor driving while suspended. Thereafter, Spielman filed a motion to suppress his confession, arguing that it was obtained through coercion, manipulation, fabrication of evidence, and false promises of a lesser sentence. Following a hearing on May 23, 2017, the trial court denied the motion to suppress.

[17]    Spielman's seven-day jury trial was held between July 17 and 26, 2017. Along with voluminous other evidence, the State presented the video of Spielman's interrogation, which was admitted into evidence without objection. Spielman testified on his own behalf and gave a new account of the night in question. He indicated that he was at Dresser's house from about 7:30 p.m. to 9:00 p.m. and that she gave him her television and let him borrow her car. He testified that he returned the next morning around 7:30 a.m., pulled the car into the garage, and then entered the house through a bedroom window because the door inside the garage was locked. Spielman said he found Dresser dead on the floor near the kitchen. He said she had "black material over her face and a sash around her neck. And I took it off." *Transcript Vol. VI* at 161. Spielman testified that he panicked and left again in her car without moving her or calling the police.

The jury found Spielman guilty as charged, despite being instructed on the lesser included offense of voluntary manslaughter. Following a sentencing hearing, the trial court imposed concurrent sentences of fifty-five years for murder and three years for Level 5 robbery, with five years suspended to probation. The trial court expressly declined to enter a sentence on the misdemeanor and vacated that conviction. Spielman now appeals. Additional facts will be presented below as needed.

## Discussion & Decision

### 1. Admission of Evidence

Spielman initially argues that his statement to police, which included his eventual confession, was admitted into evidence in violation of both the state and federal constitutions because the statement was involuntarily made. In this regard, Spielman claims that his statement was given in a coercive police environment and that the detectives made implicit promises to him regarding his sentence – ten years versus sixty or more years depending on whether he confessed. Spielman also notes that he was cold and tired and has ADHD and an anxiety disorder. Finally, he contends that the detectives provided him with all the details for his confession.[3]

---

[3] Spielman provided a number of details of the crime scene that were not provided by the detectives during the interrogation. For example, he noted the injury to her lip, the slippers, the placement of the pillows on and around Dresser's body, the location of the sash, and the black dress.

[20] Although we find Spielman's arguments lacking and generally not supported by the record, we need not reach the merits. Spielman never raised the state constitutional argument below and, with regard to the federal constitution, he only raised it in his pretrial motion to suppress. When the State moved to admit the statement at trial, defense counsel affirmatively indicated, "[n]o objection." *Transcript Vol. II* at 173. "A contemporaneous objection at the time the evidence is introduced at trial is required to preserve the issue for appeal, whether or not the appellant has filed a pretrial motion to suppress." *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010); *see also Ford v. State*, 504 N.E.2d 1012, 1013 (Ind. 1987) ("Appellate review of the voluntariness of a confession is foreclosed when the defendant did not object on this ground at trial."). Accordingly, we agree with the State that Spielman has waived this issue for appellate review.[4]

## 2. Sufficiency of the Evidence

[21] Spielman next challenges the sufficiency of the evidence supporting his convictions. When we consider a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor assess the credibility of the witnesses. *Suggs v. State*, 51 N.E.3d 1190, 1193 (Ind. 2016). Instead, we consider only the evidence and reasonable inferences supporting the conviction. *Id*. We will

---

[4] Spielman does not present a fundamental error argument in an attempt to avoid waiver.

affirm if there is probative evidence from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id*.

[22] With respect to his murder conviction, Spielman argues the evidence did not establish that he acted knowingly or intentionally when he killed Dresser. Additionally, he argues that the killing occurred because of an act of sudden heat. Both of these arguments rely on Spielman's confession (that he later abandoned at trial), in which he stated that after Dresser freaked out and hit him, he placed a dress over her head and wrapped a sash around her neck twice and tightened it. According to this account, Spielman left with the sash still tied around her neck and returned later to find her dead. The jury, however, was not required to credit every detail of Spielman's confession, especially given his tendency to change his account of the events surrounding Dresser's death and his clear attempts to lessen his culpability or avoid responsibility entirely.

[23] The evidence favorable to the murder conviction indicates that Dresser died of asphyxiation due to smothering and ligature strangulation. That is, in addition to being strangled by the sash, the autopsy indicated that Dresser suffered compression force over her mouth so much so that her lips were bruised from being pressed against her teeth. These injuries were consistent with her mouth being forced against something like a hand, pillow, or furniture. The pathologist opined that Dresser's death resulted from at least five minutes of being asphyxiated.

[24] Dresser was likely killed sometime between 12:43 a.m. and 2:30 a.m., after Spielman entered her home through a bedroom window and encountered her. Shortly thereafter, Spielman had possession of, among other things, Dresser's car, television, iPad, and wallet. At no time did he seek medical assistance for Dresser after removing the sash around her neck. Rather, he sold the television to Humphries, used Dresser's gas card, attempted to unlock the iPad, and went on joy rides with friends in Dresser's car.

[25] In sum, Spielman broke into Dresser's home in the middle of the night, overpowered her, and then wrapped a sash around her neck and forced her mouth against something to suffocate her for several minutes. Rather than seek help for her, he left with her car and other valuable possessions. The evidence clearly supports the jury's determination that Spielman intentionally or knowingly killed Dresser. *See Erlewein v. State*, 775 N.E.2d 712, 715 (Ind. Ct. App. 2002) ("Choking someone for a minimum of forty-five seconds clearly evinces an intent to kill or, at the very least, an awareness of a high probability that death would result."), *trans. denied*; *see also Harris v. State*, 499 N.E.2d 723, 728 (Ind. 1986) ("evidence, indicating Appellant brutally overpowered the victim and strangled her long enough to cause her death, clearly supports the trial court's finding that Appellant intentionally killed the victim"). Further, this evidence amply supports the jury's rejection of the existence of sudden

heat.[5] *See Brantley*, 91 N.E.3d at 572 (the existence of sudden heat is a classic question of fact to be determined by the jury).

[26] We now turn to the robbery conviction. Spielman rather baldly claims that the State failed to establish that the taking of the television "occurred because of the strangulation". *Appellant's Brief* at 21. As charged, the State was required to establish that Spielman knowingly took Dresser's television from her person or presence by using force or by threatening the use of force (that is, strangulation). *See Appendix Vol. 2* at 30; I. C. § 35-42-5-1(a). The evidence and reasonable inferences favorable to the conviction establish that Spielman strangled and suffocated Dresser and then left the residence with her television, which he loaded into the trunk of her car. This act of force provided Spielman with the opportunity to take the television from Dresser's presence and clearly constituted robbery. *See Ortiz v. State*, 716 N.E.2d 345, 352 (Ind. 1999) ("The jury could have reasonably inferred…that Ortiz's beating of his mother with a sledgehammer prevented her from retaining control over her property.").

### 3. Double Jeopardy

[27] Next, Spielman argues that his dual convictions for murder and Level 5 felony robbery violate Indiana's constitutional prohibition against double jeopardy,

---

[5] "The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder…to voluntary manslaughter." Ind. Code § 35-42-1-3(b). "Sudden heat exists when a defendant is 'provoked by anger, rage, resentment, or terror, to a degree sufficient to obscure the reason of an ordinary person, prevent deliberation and premeditation, and render the defendant incapable of cool reflection.'" *Brantley v. State*, 91 N.E.3d 566, 572 (Ind. 2018) (quoting *Isom v. State*, 31 N.E.3d 469, 486 (Ind. 2015)).

Article 1, Section 14 of the Indiana Constitution. In the context of double jeopardy, however, our Supreme Court has consistently allowed convictions for both murder and robbery, as long as the robbery is not enhanced based on bodily injury or serious bodily injury.[6] *See e.g.*, *Gross v. State*, 769 N.E.2d 1136, 1139 (Ind. 2002) (reducing robbery conviction from a Class A felony to a Class B felony because conviction for murder and Class A felony robbery violated the Indiana Double Jeopardy Clause); *Spears v. State*, 735 N.E.2d 1161, 1165 (Ind. 2000) (reducing robbery conviction to a Class C felony because there was "a reasonable possibility that the jury used the same evidentiary facts to support a murder conviction and a Class A robbery conviction"). Thus, Spielman's convictions for murder and Level 5 felony robbery (that is, robbery without an enhancement for bodily injury) do not violate double jeopardy.

### 4. Sentence

[28] Finally, Spielman challenges his sentence as inappropriate in light of his character and the nature of his offenses. Although a trial court may have acted within its lawful discretion in imposing a sentence, Article 7, Sections 4 and 6 of the Indiana Constitution authorize independent appellate review and revision of a sentence imposed by the trial court. *Alvies v. State*, 905 N.E.2d 57, 64 (Ind. Ct. App. 2009). This appellate authority is implemented through

---

[6] Pursuant to Ind. Code § 35-42-5-1(a), robbery is a Level 5 felony, which may be enhanced to a Level 3 felony if the robbery results in bodily injury or a Level 2 felony if it results in serious bodily injury to any person other than the defendant.

Indiana Appellate Rule 7(B), which provides that a court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." *Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218. Nevertheless, "we must and should exercise deference to a trial court's sentencing decision, both because Rule 7(B) requires us to give 'due consideration' to that decision and because we understand and recognize the unique perspective a trial court brings to its sentencing decisions." *Stewart v. State*, 866 N.E.2d 858, 866 (Ind. Ct. App. 2007). The appellant bears the burden of persuading us that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[29] The determination of whether we regard a sentence as inappropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Bethea v. State*, 983 N.E.2d 1134, 1145 (Ind. 2013) (*quoting Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008)). "The principal role of such review is to attempt to leaven the outliers." *Chambers v. State*, 989 N.E.2d 1257, 1259 (Ind. 2013). It is not our goal in this endeavor to achieve the perceived "correct" sentence in each case. *Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014). Accordingly, "the question under Appellate Rule 7(B) is not whether another sentence is more appropriate; rather, the question is whether the sentence imposed is inappropriate." *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008) (emphasis in original).

[30]     To assess the appropriateness of a sentence, we look first to the statutory range established for the classification of the relevant offenses. Murder has a sentencing range of forty-five to sixty-five years, with the advisory sentence being fifty-five years. Ind. Code § 35-50-2-3(a). A Level 5 felony has a sentencing range of one to six years, with the advisory sentence being three years. I.C. § 35-50-2-6. Although Spielman faced an aggregate sentence of up to seventy-one years, the trial court sentenced him to only fifty-five years with five of those years suspended to probation.

[31]     With respect to the nature of the offenses, Spielman asserts that they were not premeditated and resulted from a physical altercation. The evidence, however, demonstrates that Spielman planned the middle-of-the-night break-in, which took place while Dresser was home. When the break-in apparently did not go as planned, he then overpowered Dresser, put a dress over her head, wrapped the sash around her neck and tightened it, and also covered her mouth. He suffocated Dresser – a woman who had been exceedingly kind to him – until she died and then callously left with her car, television, wallet, and other property. With a clear lack of remorse, Spielman proceeded to sell the television, show off the car to friends, use her gas card, and drive around for the next two days. Nothing about the nature of Spielman's offenses leads us to believe that the concurrent, advisory sentences, with five years of the murder sentence suspended, were inappropriate.

[32]     Turning to Spielman's character, we observe that at the age of twenty he had three prior, unrelated misdemeanor convictions (criminal mischief, theft, and

driving while suspended) and a prior probation violation that resulted in revocation of a 325-day suspended sentence. He was also on probation at the time of the instant offense, as well as unemployed and homeless. Although Spielman apparently suffers from anxiety and ADHD, we do not find this particularly mitigating.

[33] In light of the nature of the offenses and the character of the offender, we cannot say that the aggregate fifty-five-year sentence, with five years suspended to probation, is inappropriate. We, therefore, affirm the sentence imposed.

[34] Judgment affirmed.

Najam, J. and Robb, J., concur.